THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RAYMOND SCOTT LARSEN, Defendant-Appellant.

First District (2nd Division)   No. 60714

Opinion filed March 15, 1977.

James J. Doherty, Public Defender, of Chicago (Richard D. Kharas, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Nicholas A. DeJohn, and Patrick T. Driscoll, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

Raymond Scott Larsen (hereafter defendant) was charged with the offense of murder. (Criminal Code of 1961, section 9—1; Ill. Rev. Stat. 1971, ch. 38, par. 9—1.) Following a bench trial, defendant was found guilty as charged and was sentenced to a penitentiary term of from 100 to 300 years. From this conviction defendant appeals.

The major issue presented for review is whether defendant is entitled, upon his request, to the presence of counsel at a court-ordered pretrial psychiatric examination. The psychiatrist was designated by the State for the purpose of ascertaining defendant's sanity or insanity at the time of the offense where defendant, under discovery requirement, had notified

the State that he intended to rely upon that affirmative defense at trial.

Pursuant to Supreme Court Rule 413(d) (Ill. Rev. Stat. 1971, ch. 110A, par. 413(d)), the State filed a written pretrial motion for disclosure by defendant of the defense or defenses upon which defendant intended to rely at trial; in response, defendant notified the State that he intended to rely upon the defense of insanity at the time of the offense. Thereupon, pursuant to a provision of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1971, ch. 38, par. 115—6), the State moved to require defendant to undergo a psychiatric examination by a psychiatrist designated by the State, and the trial court allowed the motion. Defendant then requested that his counsel be present at the said examination, which request was refused.

Defendant contends that he was entitled to the presence of counsel at the said examination: (1) in order to protect his fifth amendment privilege against self-incrimination; (2) becase the examination is a critical stage of the criminal proceeding under the sixth amendment; and (3) because Supreme Court Rule 413(b) (Ill. Rev. Stat. 1971, ch. 110A, par. 413(b)) provides that counsel shall have the right to be present at physical or medical inspections of defendant's body. Defendant also contends that, in further violation of Supreme Court Rule 413(b), he was not properly notified of the said psychiatric examination; that the State failed to prove him *sane* at the time of the offense beyond a reasonable doubt; and that his sentence was excessive.

The State's case-in-chief established the following facts. On May 12, 1972, defendant was released from the Joliet Branch of the Illinois State Penitentiary on a three-day furlough for good behavior as an inmate of that institution. On May 17, 1972, Francis Casolari (hereafter decedent), age 16, went fishing after school in a forest preserve area known as Schiller Woods. His parents became concerned when decedent did not return home for dinner. The police were notified on that evening that the boy was missing. An exhaustive search of the Schiller Woods area was made. Decedent's dead body was found there by the police in the early morning hours of May 18, 1972.

At approximately 4 a.m. the next day, in another part of Schiller Woods, the police stopped a car operated by defendant, in which his brother, Gary Larsen, and a young woman were passengers. In open view, in the console area of the vehicle, the police observed a rifle, a hand pellet gun, and two containers of pellets. The individuals were placed in custody and taken to the police station. The weapons were subsequently established by the crime laboratory as being the one which fired the 23 to 25 rounds of ammunition which killed decedent.

At the police station, defendant made an oral confession to an Assistant State's Attorney and several police officers. Defendant stated that he

drove out alone to Schiller Woods on May 17, 1972. It was just before dark. Defendant parked his car in a parking area and removed the two weapons he had in the car. He then walked along a bridle path adjoining the Des Plaines River. He was looking for something to shoot when he observed decedent fishing from the river bank approximately 50 feet away. Defendant fired the rifle and shot decedent in the abdomen. Decedent fell, groaning and screaming. Defendant continued to fire until he was silent. Defendant then dragged the body into some shrubbery. He began to disrobe it, but became apprehensive when he heard people approaching. Defendant then ran to his car and left the area. He was not under the influence of alcohol or drugs at the time of the killing.

Defendant conceded at trial that he did the acts which caused the death of decedent. He raised only the affirmative defense of insanity at the time of the offense.[1]

Three lay witnesses were called on behalf of defendant: Darlene Jacobek, defendant's half-sister; Gary Larsen, his brother, and Grace Romagnoli, his maternal grandmother. Collectively, these witnesses testified as to the unsavory atmosphere in which defendant grew up. Jack Larsen, defendant's father, was a drunkard and ex-convict. He repeatedly threatened and beat defendant's mother, Nellie Larsen, and the children. From time to time, defendant stayed with his grandmother for a few days or weeks because "he couldn't live at home." Defendant, as a boy, lived in fear of his father. The family moved often because Jack was continually switching jobs, with varying periods of unemployment between jobs. At one point, Nellie and the three children left Jack to live with Mrs. Romagnoli. Jack threatened to kill her if she didn't return. Nellie and the children moved back. When defendant was 15 and his brother Gary was 13, they both moved in with their grandmother permanently. Their sister Darlene had previously done the same thing. When Nellie died on May 17, 1966, exactly six years before decedent's murder, defendant was severely affected. At the funeral, Jack accused him of causing his mother's death by always getting into trouble.

In addition, Gary testified that defendant began using drugs, including LSD, heroin, and amphetamines, at the age of 11 or 12. When Gary saw

---

[1] Insanity is defined in section 6—2 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 6—2) as follows:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

defendant a few days after defendant had been released from the penitentiary in May of 1972, defendant had barbiturates in his possession and appeared to have taken some. Defendant was mumbling and laughing to himself, and did not appear to know what he was doing.

Defendant also called as an expert medical witness, Dr. Marvin Ziporyn, a psychiatrist. Ziporyn testified that he examined defendant on July 1, 1973, at the Cook County Jail. (Defendant had filed a motion for this examination and the motion had been allowed.) An evaluation of defendant's mental status was made by observing his physical mannerisms, tone of voice, gestures, and by a question and answer discussion. Prior to the examination, the witness was informed of the crime charged and that defendant had had difficulties with his father. Some of defendant's penal records were also made available to the witness.

Ziporyn made the general diagnosis that defendant was suffering from an organic brain syndrome associated with cerebral trauma. Defendant's condition was characterized as a post-traumatic personality disorder, defined as a change of personality which is a result of damage to the central nervous system. The witness further noted certain psychodynamic factors (defined as psychological factors in an individual which motivate that individual to behave in any of several different directions) which he found operative in defendant: (1) the presence of a severe castration anxiety; (2) the presence of a supreme degree of hostility and anger; (3) the presence of a pervasive depression; and (4) the presence of an addictive personality. The witness placed great importance on defendant's strong attachment to his deceased mother as the source of behavioral symptoms manifested after her death.

In response to a hypothetical question which described the background and behavior in evidence concerning defendant, Ziporyn testified that in his opinion the hypothetical man was suffering from a mental defect at the date of the killing. Although the hypothetical man had the capacity to appreciate the criminality of his conduct, the defect caused him to lack substantial capacity to conform his conduct to the requirements of the law.

On cross-examination, the witness related a conversation he had had on August 15, 1973, with the two Assistant State's Attorneys who tried the case below. In that conversation, Ziporyn told the prosecutors that defendant would have been able to conform his conduct to the requirements of the law in the absence of drug usage.

The witness further stated on cross-examination that he did not utilize any psychological tests, did not administer an electroencephalogram, did not have defendant examined by a neurologist, and did not administer any sodium pentothal to minimize falsity and malingering. On redirect

examination, Ziporyn stated that there was no need for supportive testing or an electroencephalogram; the clinical material was so definitive that defendant was insane on May 17, 1972, that no substantiation was required.

In rebuttal, the State presented two lay witnesses and one expert medical witness to show that defendant had the capacity to conform his conduct at the time of the offense to the requirements of the law. The first witness was one Lawnie Suchy, a housewife from whom defendant stole a rifle and money on the day of the killing. Defendant entered her apartment at gunpoint about 1 p.m. The witness had previously suffered a broken nose and broken ribs, and was wearing a rib belt to protect her ribs. Defendant took her into the bedroom and began to disrobe her when he observed the rib belt. He asked her what it was and she informed him of its purpose. The witness asked him not to rape her. He replied that he would not rape or hurt her. They did not have intercourse. Before he left, she thanked him for not raping or hurting her. Defendant replied: "But I did hurt you, I hurt your pride and your self-respect and your pocketbook." Defendant then walked out of the apartment, approximately 45 minutes after he entered.

The next witness was Sergeant Howard Cherry, a prison guard at the Joliet Branch of the Illinois State Penitentiary. Cherry testified that defendant's work assignment at the penitentiary was as a clerk-typist in a minimum security area. He was also housed in a minimum security area. Defendant had no disciplinary problems while an inmate of that institution.

The State's final witness was Dr. Robert Reifman, Assistant Director of the Psychiatric Institute of the Circuit Court of Cook County. Reifman had examined defendant twice. On the first examination, on January 26, 1973, pursuant to a defense motion which had been allowed, Reifman was acting as a court-designated psychiatrist for the purpose of ascertaining defendant's fitness to stand trial. Defendant was given a routine screening examination, including a question and answer interview by the witness, and defendant's grandmother was interviewed by a social worker employed by the Institute. Reifman, at that time, concluded that defendant could understand the nature of the charges pending against him and was able to cooperate with his attorney.

On the second examination, on August 24, 1973, pursuant to a State motion which had been allowed, Reifman was acting as a prosecution-designated psychiatrist for the purpose of ascertaining defendant's sanity on May 17, 1972. Defendant was given various psychological tests, including a Bender-Gestalt test, a draw-a-person test, and a sentence completion test. An electroencephalogram was administered. There was also a question and interview. The witness' diagnosis, based

on interview and observation, supportive testing, and the electroencephalogram, was that defendant had a personality disorder known as anti-social personality. He found no evidence that defendant was suffering from the mental defect known as organic brain syndrome on the date of the offense. In response to a hypothetical question which incorporated the background and behavior in evidence concerning defendant, Reifman stated that it was his opinion that the hypothetical man was not suffering from any mental defect or disease, and had substantial capacity to appreciate the criminality of his conduct and had substantial capacity to conform his conduct to the requirements of the law. All of this testimony by Dr. Reifman was admitted over objection by defendant on the ground that he had been denied his right to the presence of his counsel at the examination.

I.

■■ Before proceeding to the merits of the controversy, we need to consider whether defendant waived the right to challenge the judgment of the trial court by failing to file any post-trial motion for a new trial. It is well established that an alleged error will not be reviewed unless asserted at trial. This applies to constitutional and nonconstitutional questions. (*People v. Long* (1968), 39 Ill. 2d 40, 233 N.E.2d 389.) If a written post-trial motion is made, a failure to include an alleged error in that motion constitutes a waiver of that issue and it cannot be raised on appeal. (*People v. Horton* (5th Dist. 1973), 15 Ill. App. 3d 51, 303 N.E.2d 534.) A post-trial motion is not necessary in a bench trial to preserve for review questions of the sufficiency of the evidence. (*People v. Hoffman* (1942), 381 Ill. 460, 45 N.E.2d 874.) Other types of error will be preserved in a bench trial *if* they were somehow brought to the trial court's attention; a trial court must be made aware of alleged errors so that it has the opportunity to correct the alleged error involved. (*People v. Guynn* (3d Dist. 1975), 33 Ill. App. 3d 736, 338 N.E.2d 239.) However, even if an alleged error is not brought to the attention of the trial court, this court has authority under Supreme Court Rule 615(a) (Ill. Rev. Stat. 1971, ch. 110A, par. 615(a)) to consider the error if it affects substantial rights, and if fundamental fairness requires that it be corrected. *People v. McAdrian* (1972), 52 Ill. 2d 250, 287 N.E.2d 688, *People v. Bonds* (1st Dist. 1975), 26 Ill. App. 3d 703, 325 N.E.2d 388.

In the instant case, the record shows that the trial court had been made aware of every alleged error urged in this appeal. Before Dr. Reifman testified, defendant objected to his testimony because defendant had not been allowed to have his counsel present at the psychiatric examination conducted by Dr. Reifman, and because defendant did not receive adequate notification of the examination. Defendant's closing argument

to the trial court stressed the State's alleged failure to prove him sane, at the time of the offense, beyond a reasonable doubt. And the same argument that is used in this appeal for reduction of sentence was employed by defendant in the aggravation and mitigation proceeding below. In light of the foregoing principles, we hold that all of the issues raised by defendant in this appeal are properly before this court despite the absence of any post-trial motion for a new trial, and all of the issues will be considered in this opinion.

## II.

### A.

We now address ourselves to defendant's contention that he was entitled to the presence of counsel at his second court-ordered psychiatric examination in order to protect his fifth amendment privilege against self-incrimination. We inquire first as to whether defendant has any fifth amendment privilege to be protected.

In *Schmerber v. California* (1966), 384 U.S. 757, 761, 16 L. Ed. 2d 908, 914, 86 S. Ct. 1826, 1830, the Supreme Court formulated a test to determine the scope of the privilege against self-incrimination. "We hold that the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." The court concluded that the taking of a blood sample from a suspect accused of drunk driving did not provide the State with evidence of a testimonial or communicative nature, and, thus, did not violate the suspect's fifth amendment rights.

The distinction is between "real or physical evidence" and communications or testimony. However, the *Schmerber* court noted that the distinction is not always applicable:

"Although we agree that this distinction is a helpful framework for analysis, we are not to be understood to agree with past applications in all instances. There will be many cases in which such a distinction is not readily drawn. Some tests seemingly directed to obtain 'physical evidence,' for example, lie detector tests measuring changes in body function during interrogation, may actually be directed to eliciting responses which are essentially testimonial. To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment. Such situations call to mind the principle that the protection of the privilege 'is as broad as the mischief against which it seeks to guard,' Counselman v. Hitchcock, 142 U.S. 547, 562." 384 U.S. 757, 764, 16 L. Ed. 2d 908, 916, 86 S. Ct. 1826, 1832.

To our knowledge, the United States Supreme Court has never directly ruled on whether the privilege against self-incrimination attaches to a court-ordered pretrial psychiatric examination by a psychiatrist designated by the prosecution in order to determine sanity at the time of the defense when that defense is to be raised by defendant at trial. But several lower Federal courts have applied the *Schmerber* test to hold that the privilege does attach and is not waived by defendant's reliance on that defense at trial. In *Thornton v. Corcoran* (D.C. Cir. 1969), 407 F.2d 695, a defendant, charged with the rape of a young girl, applied in the Court of Appeals for the issuance of a writ of mandamus directing the district judge to issue an order that would allow defense counsel and an independent psychiatrist to attend a hospital staff conference scheduled to be held in order to determine defendant's fitness to stand trial and his sanity at the time of the offense. The court held that a writ of mandamus was an inappropriate remedy for the relief sought. In dicta, Judge Bazelon discussed the merits of the fifth (and sixth) amendment claims. He concluded that the conference interview did involve evidence of a testimonial or communicative nature, but distinguished the conference interview from the situation (as in the instant case) where a suspect is interviewed by a single prosecution-designated or court-designated examining doctor. In a conference interview, Judge Bazelon stated, the possibility that the presence of a third party, in a legal and nonmedical capacity, would impair the efficacy of the examination is considerably diminished. The argument that a lawyer would prove to be a fatally disruptive influence, therefore, loses much of its force. (407 F.2d 695, 701.) (Judge Bazelon's conclusions regarding defendant's *sixth* amendment argument will be discussed in Part IIB of this opinion.) Judge Burger vigorously dissented, arguing that "the presence of a lawyer for the patient at a staff conference would obviously inhibit the free expression and exchange of ideas which normally occurs." 407 F.2d 695, 711.

Some State courts, utilizing reasoning consistent with *Thornton*, have held that the fifth amendment privilege attached to a pretrial psychiatric examination; that the privilege was not waived by relying upon the defense of insanity at the time of the offense; and therefore that the accused could not be compelled to answer the psychiatrist's questions. *Shepard v. Bowe* (1968), 250 Ore. 288, 442 P.2d 238, *French v. District Court, Division 9* (1963), 153 Colo. 10, 384 P.2d 268, and *Johnson v. People* (1970), 172 Colo. 72, 470 P.2d 37.

Most State and Federal courts, however, while holding either explicitly or implicitly that the fifth amendment privilege does attach, have nevertheless seen fit to require an accused to submit to the psychiatric examination and to answer all questions asked of him where the accused has introduced, or has indicated that he will introduce, the testimony of

his examining psychiatrist in making his prima facie showing on the defense of insanity at the time of the offense. The rationale is not always clear, but is usually based on principles of waiver or estoppel. *United States v. Malcolm* (9th Cir. 1973), 475 F.2d 420. For example, in *Pope v. United States* (8th Cir. 1967), 372 F.2d 710, *vacated on other grounds*, 392 U.S. 651, 20 L. Ed. 2d 1317, 88 S. Ct. 2145, it was held that a defendant waived his privilege against self-incrimination by raising the issue of insanity and presenting evidence as to his mental incompetency through his own and his expert's testimony. The defense thereby raised the issue for all purposes and the government was appropriately granted leave to have defendant examined by experts of its choice and to present their opinions in evidence. In agreement with *Pope* is *State v. Canaday* (1970), 2 Ore. App. 390, 467 P.2d 666. As already noted, by concluding that a defendant had waived his fifth amendment rights, *Pope* and *Canaday* implicitly recognized that the privilege against self-incrimination did attach to the pretrial psychiatric examination. This was explicitly stated in *Lee v. County Court* (1971), 27 N.Y.2d 432, 267 N.E.2d 452, *cert. denied*, 404 U.S. 823, 30 L. Ed. 2d 50, 92 S. Ct. 46, which held that a defendant's waiver simply permitted the State's psychiatrist to testify as to facts which formulated the basis of his medical opinion on the question of sanity at the time of the offense.

The Second Circuit Court of Appeals has adopted the view that a defendant who raises the issue of insanity at the time of the offense and introduces expert testimony as to that issue is *estopped* from objecting to a government psychiatrist's testimony in rebuttal as to all matters on which the latter's contrary opinion is based. *United States v. Baird* (2d Cir. 1969), 414 F.2d 700, *cert. denied*, 396 U.S. 1005, 24 L. Ed. 2d 497, 90 S. Ct. 559; *United States v. Trapnell* (2d Cir. 1974), 495 F.2d 22.

The waiver and estoppel theories have been subject to criticism. (See, *e.g.*, Note, *Pretrial Psychiatric Examinations and The Privilege Against Self-Incrimination*, 1971 U. Ill. L. F. 232; Note, *Miranda on the Couch: An Approach to Problems of Self-Incrimination, Right to Counsel, and Miranda Warnings in Pre-Trial Psychiatric Examinations of Criminal Defendants* (1975), 11 Col. J. of L. & Soc. Prac. 403.) The criticism is generally twofold: (1) The defendant may not be competent knowingly and intelligently to waive his fifth amendment rights;[2] and (2) the defense of insanity is constitutionally protected and cannot be subject to conditions of waiver or estoppel.[3]

---

[2] C.F., *Pate v. Robinson* (1966), 383 U.S. 375, 384, 15 L. Ed. 2d 815, 821, 86 S. Ct. 836, 841: "The State insists that Robinson deliberately waived the defense of his competence to stand trial by failing to demand a sanity hearing as provided by Illinois law. But it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." As we see it this criticism would apply only as to waiver of the issue of sanity at the time of trial.

[3] The Supreme Court has never directly ruled upon this question. However, there is some

Other courts have taken the position that, with the proper safeguards, the fifth amendment· is not necessarily violated by merely requiring a defendant, who relies upon the defense of insanity at the time of the offense, to undergo a psychiatric examination by a State-designated psychiatrist and to answer all questions which the psychiatrist deems necessary in order to enable him to form his expert opinion. This view is premised on mutuality and on the maintenance of a fair State-individual balance. The safeguards referred to relate to fifth amendment limitations upon the use of any incriminatory statements made by the defendant to the psychiatrist during the examination in response to the questions asked by the psychiatrist. The frequently cited case of *State v. Whitlow* (1965), 45 N.J. 3, 210 A.2d 763, held that a defendant who pleads mental incapacity to stand trial, or legal insanity at the time of the crime, must submit to a court-ordered psychiatric examination by a State-designated psychiatrist and answer all questions deemed necessary by the examiner to enable him to form an expert opinion, so long as certain conditions are met. One condition is that inculpatory statements made during the course of an examination are not competent as admissions of guilt. Their probative force is limited solely to the sanity issue and, if introduced at trial, the jury must be told so immediately. Another condition is that· defense medical experts may attend the psychiatric examination. The court stated the rationale underlying its decision:

> "It would be most anomalous to say that a defendant may advance the defense of insanity, have himself examined by his own experts and then invoke the constitutional guarantees against self-incrimination for the purpose of preventing examination by the State. [Citation]. It would be a strange doctrine, indeed, to permit a person charged with crime to put in issue his want of mental capacity to commit it, and in order to make his plea invulnerable, prevent all inquiry into his mental state or condition. [Citation.] To allow the accused to obtain his own expert, and after a private and unlimited conference with him and examination by him, to plead insanity, and then put forward the privilege against self-incrimination to frustrate like activities by the prosecution is to balance the competing interests unfairly and disproportionately against the public." 45 N.J. 3, 11, 210 A.2d 763, 767.

■■ *United States v. Albright* (4th Cir. 1968), 388 F.2d 719, 724, following the *Whitlow* lead, held that a court-ordered pretrial psychiatric examination was not a *per se* violation of the privilege against self-

supporting case law authority for the view that the insanity defense is guaranteed under due process of law. *State v. Strasburg* (1910), 60 Wash. 106, 110 P. 1020; *Sinclair v. State* (1931), 161 Miss. 142, 132 S. 581; *Thomas v. Cunningham* (4th Cir. 1963), 313 F.2d 934; *State ex rel. LaFollette v. Raskin* (1967), 34 Wisc. 2d 607, 150 N.W.2d 318. But see *Powell v. Texas* (1968), 392 U.S. 514, 535-36, 20 L. Ed. 2d 1254, 1269, 88 S. Ct. 2145, 2156, in which the court indicated reluctance to treat the defense of insanity in constitutional terms.

incrimination on the basis of the maintenance of a fair State-individual balance. As the burden of proving legal sanity at the time of the offense beyond a reasonable doubt is on the prosecution when a defendant has made a prima facie showing on his affirmative defense of insanity at the time of the offense, the prosecution "cannot be denied access to the only reliable means of ascertaining the truth concerning a defendant's sanity." The court reasoned that the *Schmerber* test was inappropriate and should not be applied to pretrial psychiatric examinations:

> "The manifest purpose of the examination in this case was, and the proper objective of a mental examination in any criminal case where a defendant's sanity is in issue should be, to obtain knowledge not about facts concerning defendant's participation in the criminal acts charged, but about facts concerning a defendant which are themselves material to the case. [Citation.] The purpose is not to prove by evidence wrested from a defendant whether he is guilty as charged but, rather, to prove whether a defendant possesses the requisite mentality to be guilty as charged, assuming that his guilt is otherwise established, or whether, legally, he cannot be held criminally responsible, irrespective of what other proof may establish he has done. The 'testimonial' or 'communicative' test of what is and what is not within the privilege against self-incrimination, invoked in *Schmerber v. State of California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), is not an appropriate distinction to be applied in the case at bar, but that test is not absolute because, as stated in *Schmerber*, it is only 'a helpful framework for analysis,' and '[T]here will be many cases in which such a distinction is not readily drawn.' " 388 F.2d 719, 723.

But the *Albright* court was careful to note that, without proper limitations, the privilege against self-incrimination may be violated. However, as the prosecution was *statutorily* prohibited from using inculpatory statements on the issue of guilt (18 U.S.C. §4244 (1970)), and, as the defendant had admitted committing the acts charged and had contested sanity only, the privilege was not violated. The other safeguard in *Whitlow*, that defense experts be allowed to attend the government psychiatric examination, was not required. The fair State-individual balance approach was also adopted in *People v. Martin* (1971), 386 Mich. 407, 192 N.W. 2d 215, *cert. denied*, 408 U.S. 929, 33 L. Ed. 2d 342, 92 S. Ct. 2505.

The view that an accused is adequately protected by a limiting jury instruction that inculpatory statements made to an examining State psychiatrist and admitted into evidence through the testimony of the psychiatrist may be considered only on the issue of insanity has been criticized. In *State v. Olson* (1966), 274 Minn. 225, 143 N.W.2d 69, the court stated that it is difficult to conceive of a jury not considering such

evidence on the issue of guilt. The court in *Shepard v. Bowe* reasoned that a suspect's fifth amendment rights would be violated even *with* such a limiting instruction because the statements made to the psychiatrist could provide State investigative officers with a lead to other evidence which would incriminate the suspect on the issue of guilt. The Wisconsin courts have determined that the only solution to the problem of the admissibility of inculpatory statements made by the defendant to the psychiatrist during the examination is a bifurcated trial. The first stage is conducted on the issue of guilt. If a guilty verdict is returned, a second stage by the same jury is conducted on the issue of insanity. No incriminating statements made by the defendant during a psychiatric examination can be introduced in the guilt stage of the trial. *State ex rel. LaFollette v. Raskin* (1967), 34 Wisc. 2d 607, 150 N.W.2d 318.

Although there are no Illinois cases directly on point, our cases which have dealt with related situations indicate a preference for the fair State-individual balance approach. *People v. English* (1964), 31 Ill. 2d 301, 201 N.E.2d 455, involved a proceeding under the Sexually Dangerous Persons Act (Ill. Rev. Stat. 1961, ch. 38, par. 820.01-825(e)) to have defendant declared a sexually dangerous person. Two psychiatrists were appointed by the court to examine defendant. Defendant informed them that he thought that the compulsory psychiatric examination was a violation of his constitutional rights and he refused to be examined. Hence, no examination was conducted and defendant was held in contempt. He appealed on the ground that the contempt order violated his privilege against self-incrimination.

Our supreme court held that the privilege protected defendant from making any statements to psychiatrists which tended to incriminate him. However, he was not privileged from submitting to those parts of the examination which did not call upon his testimonial capacity, even though the information obtained may be incriminating. But the court distinguished the situation where the legislature has removed the incriminating nature of a statement made by an accused. For example, former section 104—2(d) of the Criminal Code of Procedure of 1963 (Ill. Rev. Stat., ch. 38, par. 104—2(d), repealed January 1, 1973, replaced by ch. 38, par. 1005—2—1(h)) provided that no statement made by the accused during the course of an examination to determine competency to stand trial shall be admitted in evidence on the issue of guilt. This statute, the court concluded, effectively removed the privilege against self-incrimination in a hearing to determine competency.

In *People v. Williams* (1967), 38 Ill. 2d 115, 230 N.E.2d 224, defendant contended that permitting the two psychiatrists who examined him in connection with his competency hearing to testify at the trial violated his right against self-incrimination as guaranteed by the Illinois Constitution. The court interpreted former section 104—2(d) as prohibiting the use of

statements made by an accused during a competency examination which are offered for their truth as opposed to statements offered to show defendant's mental condition. As the trial court did restrict the examining psychiatrists within the statutory limitation, defendant's privilege against self-incrimination was not violated. See also *People v. Lowe* (4th Dist. 1969), 109 Ill. App. 2d 236, 248 N.E.2d 530; *People v. Ehrler* (2d Dist. 1969), 114 Ill. App. 2d 171, 252 N.E.2d 227.

The Illinois statute covering pleas of not guilty by reason of insanity at the time of the offense (Ill. Rev. Stat. 1971, ch. 38, par. 115—6) is comparable to the statute covering examinations to determine competency to stand trial. It provides that any statements made by a defendant to a court-appointed examining psychiatrist, named by the prosecuting attorney, "shall not be admissible against the defendant unless he raises the defense of insanity or the defense of drugged condition, in which case they shall be admissible only on the issue of whether he was insane or drugged." Thus, the legislature has removed the incriminating nature of statements made during an examination directed to the issue of insanity at the time of the offense in the same manner as in competency examinations.

The only Illinois case which we have found dealing directly with the issue of the applicability of the fifth amendment to pretrial psychiatric examination to determine sanity at the time of the offense is *People v. Wax* (4th Dist. 1966), 75 Ill. App. 2d 163, 220 N.E.2d 600, *cert. denied,* 387 U.S. 930, 18 L. Ed. 2d 991, 87 S. Ct. 2051. In that case defendant claimed he was deprived of benefit of counsel by an encounter with a State psychiatrist. The psychiatrist called on defendant at the jail and identified himself as a doctor making an examination at the request of the State's Attorney. Following the introduction, there was no conversation for about 20 minutes. The silence was broken by the doctor asking defendant if he had ever been in the Army, Navy, or Marine Corps. Defendant shook his head no. Following another period of silence, defendant asked to have the sheriff get his attorney. The attorney arrived shortly thereafter, but no further examination was conducted. The doctor subsequently testified at trial that defendant was sane at the time of commission of the offense.

The case was decided prior to *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and the *Wax* court regarded the presence or absence of the element of self-incrimination as the key factor in the resolution of defendant's right to counsel claim. The court concluded that the mutual observation of the doctor and defendant prior to defense counsel's arrival did not involve testimonial compulsion as to inculpating matters. Thus, under *Schmerber v. California,* defendant's privilege against self-incrimination was not violated.

■■ We believe the sounder approach is the fair State-individual

balance position adopted by *United States v. Albright*. The proper safeguards are provided in section 115—6, prohibiting the use of inculpatory statements on the issue of guilt. Under this approach, the fifth amendment privilege, while it does attach to the pretrial psychiatric examination, has been effectively safeguarded by State statute, with the result that a defendant does not have the right to refuse to answer the psychiatrist's questions. This position is consistent with the Illinois cases dealing with the closely related situation of inculpating statements made in an examination directed to defendant's competency to stand trial.

The chief weakness of the fair State-individual balance approach is the failure of the limiting jury instruction to adequately protect defendant's interests. However, as was pointed out in *Whitlow*, admission of evidence for a limited purpose is not an uncommon or unsanctioned practice. We must assume that jurors obey a court's restrictive instructions with respect to such evidence. *People v. Carter* (1967), 38 Ill. 2d 496, 232 N.E.2d 692, *cert. denied*, 391 U.S. 965, 20 L. Ed. 2d 877, 88 S. Ct. 2033.

### B.

Defendant contends he was entitled to counsel at the pretrial psychiatric examination under the sixth amendment because the examination is a critical stage of the prosecution. This argument is based on *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, in which the Supreme Court ruled that an accused is entitled to counsel at a post-indictment lineup. The lineup was held to be a critical stage of the prosecution due to the substantial risk that counsel's absence might derogate from defendant's right to a fair trial.

Analysis of fingerprints, blood sample, clothing, hair, etc., were distinguished as mere preparatory steps in the gathering of the prosecution's evidence. Technology is sufficiently available and the techniques few enough, the court reasoned, that the defendant had the opportunity for meaningful confrontation through the ordinary processes of cross-examination and presentation of his own evidence. By contrast, the post-indictment lineup was found to be "riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial," primarily the high degree of suggestiveness in the manner in which the suspect is presented to the witness. A witness, once having chosen a suspect out of a lineup, is not likely to change his mind in the future. The defendant, in many instances, is not in a position to detect subtle improprieties. Furthermore, even if he observes abuse, he may be reluctant to take the stand and open the door for admission of prior convictions.

> "Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can

often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution * * *. No substantial countervailing policy considerations have been advanced against the requirement of the presence of counsel. * * * And to refuse to recognize the right to counsel for fear that counsel will obstruct the course of justice is contrary to the basic assumptions upon which this Court has operated in Sixth Amendment cases." 388 U.S. 218, 236-38, 18 L. Ed. 2d 1149, 1162-63, 87 S. Ct. 1926, 1937-38.

*Wade* was limited by *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, in which the court held that a preindictment lineup was not a critical stage of the prosecution because advisory judicial proceedings had not been initiated against the accused. The right of counsel does not attach to proceedings which are not part of the criminal prosecution. *Ganz v. Bensinger* (7th Cir. 1973), 480 F.2d 88.

A few courts have accepted the argument that a pretrial psychiatric examination is a critical stage at which an accused is entitled to counsel. The leading case is again *Thornton v. Corcoran* (D.C. Cir. 1969), 407 F.2d 695. Although the *Thornton* court did not resolve the right to counsel issue, it concluded that the claim was not frivolous. However, the court did leave open the possibility that if an accused's right to cross-examine could be protected in another way (*i.e.*, recording some or all parts of the staff conference), presence of counsel would not be constitutionally required. Judge Burger, in dissent, contended that a psychiatric examination is investigative and fact-finding in nature rather than adversarial or confrontational, that an examination is not conducted in circumstances of marginal reliability, and that a lawyer's presence would inhibit a free exchange of views and disrupt the sensitive doctor-patient relationship.

A few cases have held that a psychiatric examination is a critical stage. *Lee v. County Court* (1971), 27 N.Y.2d 432, 267 N.E.2d 452, *cert. denied*, 404 U.S. 823, 30 L. Ed. 2d 50, 92 S. Ct. 46, held that the *Wade* rationale provided for presence of defense counsel at examinations to make more effective an accused's basic right of cross-examination. However, the court limited counsel's function to that of an observer; he may not take an active role in the examination nor advise his client not to answer questions. The prosecutor, on the basis of fairness, was also entitled to be present under the same restrictions. *In re Spencer* (1965), 46 Cal. Rptr. 753, 406 P.2d 33, a pre-*Wade* decision, held the examination was a critical stage only if inculpatory statements made during the course of the examination could be subsequently introduced at trial to prove guilt.

However, Burger's dissenting view has emerged as the majority position today. (*United States v. Baird* (2d Cir. 1969), 414 F.2d 700, *cert. denied*, 396 U.S. 1005, 24 L. Ed. 2d 497, 90 S. Ct. 559; *United States v.*

*Trapnell* (2d Cir. 1974), 495 F.2d 22; *United States v. Albright* (4th Cir. 1968), 388 F.2d 719; *United States v. Smith* (5th Cir. 1971), 436 F.2d 787; *United States ex rel. Wax v. Pate* (N.D. Ill. 1967), 298 F.Supp. 164, *aff'd* (7th Cir. 1969), 409 F.2d 498, *cert. denied*, 396 U.S. 830, 24 L. Ed. 2d 81, 90 S. Ct. 83; United States v. Mattson (9th Cir. 1972), 469 F.2d 1234, *cert. denied*, 410 U.S. 986, 36 L. Ed. 2d 183, 93 S. Ct. 1513; *People v. Martin* (1971), 386 Mich. 407, 192 N.W.2d 215, *cert. denied* 408 U.S. 929, 33 L.Ed. 2d 342, 92 S. Ct. 2505; *State v. Wilson* (1971), 26 Ohio App. 2d 23, 268 N.E.2d 814; *Commonwealth v. Stukes* (1969), 435 Pa. 535, 257 A.2d 828.) Indeed, even in the District of Columbia Circuit in which *Thornton* was decided, one court termed the fifth and sixth amendment conclusions mere dicta and refused to follow them. *United States v. Fletcher* (D.D.C. 1971), 329 F. Supp. 160.

■■ We choose to adopt the majority view that a pretrial psychiatric examination is not a critical stage. The examination is not conducted under suspect circumstances with a high degree of inherent suggestiveness or unfairness to the accused. Unquestionably, defense counsel's presence might aid a cross-examination of the examining psychiatrist at trial. However, the effect of counsel's presence may destroy the usefulness of the examination. We do not believe *Wade* requires invasion of the privacy of the psychiatrist-patient relationship, even if the psychiatrist is court-appointed upon the State's motion.

## C.

Defendant also contends he was entitled to presence of counsel under Illinois law. The statute applicable to the appointment of a psychiatrist at the request of the State (Ill. Rev. Stat. 1971, ch. 38, par. 115—6) provides in part as follows:

> "If the defendant has given notice that he may rely upon the defense of insanity as defined in Section 6—2 of the Criminal Code of 1961 or the defense of intoxicated or drugged condition as defined in Section 6—3 of the Criminal Code of 1961 or if the facts and circumstances of the case justify a reasonable belief that the aforesaid defenses may be raised, the Court shall, on motion of the State, order the defendant to submit to examination by at least one psychiatrist, to be named by the prosecuting attorney. The Court shall also order the defendant to submit to an examination by one neurologist, one psychologist and one electroencephalographer to be named by the prosecuting attorney if the State asks for one or more of such additional examinations."

On August 14, 1973, the State moved the trial court "for the submission of the defendant for an examination by one psychiatrist, one neurologist, one psychologist, and one electroencephalographer to be named by the

prosecution." The court initially refused to sign an order until supplied with the doctor's name and place of the examination. On August 16, 1973, an order was entered which appointed Dr. Reifman to conduct a psychiatric examination upon defendant. The examination was ordered to take place "on August 23, 1973, or on any date subsequent, necessary to complete such examination." No mention was made in the order of the appointment of an electroencephalographer.

On August 24, 1973, defendant was given a psychiatric examination by Dr. Reifman. He was also given an electroencephalogram test on that date. The test was administered by a qualified technician, one Miss Triggs, and the results were interpreted by one Dr. Gibbs. An electroencephalogram test, Dr. Reifman explained at trial, is a test in which electrical impulses are read from the brain by attaching electrodes by paste to the individual's head. The purpose of the test is to find an organic malfunction of the brain. Dr. Reifman stressed that the test was not definitive; a normal test would not necessarily indicate the absence of brain damage. It would, however, be corroborative of a clinical examination.

Defendant argues Supreme Court Rule 413 (Ill. Rev. Stat. 1971, ch. 110A, par. 413) gave him the right to have had his lawyer present at the above examinations. The State responds that the Rule is applicable to physical, not psychiatric, examinations. The pertinent provisions of Rule 413 are:

"(a) The person of the accused. Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, a judicial officer may require the accused, among other things, to:

(i) appear in a line-up;

(ii) speak for identification by witnesses to an offense;

(iii) be fingerprinted;

(iv) pose for photographs not involving reenactment of a scene;

(v) try on articles of clothing;

(vi) permit the taking of specimens of material under his fingernails;

(vii) permit the taking of samples of his blood, hair and other materials of his body which involve no unreasonable intrusion thereof;

(viii) provide a sample of his handwriting; and

(ix) submit to a reasonable physical or medical inspection of his body.

(b) Whenever the personal appearance of the accused is required for the foregoing purposes, reasonable notice of the time and place of such appearance shall be given by the State to the

accused and his counsel, who shall have the right to be present. Provision may be made for appearances for such purpose in an order admitting the accused to bail or providing for his release."

■■ We have failed to find, nor have the parties directed us to, any cases which have interpreted the key phrase "reasonable physical or medical inspections of his body." The Rule is directed toward procuring *physical* evidence, such as fingerprints, blood samples and the like. We do not believe it was intended to extend to mental examinations the procedural safeguards enumerated therein. We, therefore, reject defendant's argument regarding right to counsel, under Rule 413, at the psychiatric examination.

■■ We need not decide whether Rule 413 is applicable to the electroencephalogram test because the test was improper for another reason. The August 16, 1973, order provided only for a psychiatric examination to be conducted by Dr. Reifman. The electroencephalogram test, conducted by Miss Triggs and Dr. Gibbs, was beyond the scope of the order. Thus, the statute regulating appointment of an electroencephalographer (Ill. Rev. Stat. 1971, ch. 38, par. 115—6) was not complied with.

However, we do not think the failure to comply with this statute constitutes reversible error because defendant has not shown that he was prejudiced by having to submit to the improper electroencephalograph examination. Dr. Reifman did testify that he considered the test results, which indicated an absence of organicity, in arriving at his opinion. But he also testified that he considered the electroencephalogram merely corroborative of the other psychological tests given and his interview with the defendant. With regard to the hypothetical question asked by the State which incorporated the evidence concerning defendant's background and behavior, Reifman stated his opinion would not have been different had the electroencephalogram test not been given.

In summary, for the reasons herein stated, we hold defendant did not have a right to presence of counsel at the psychiatric examination. The electroencephalogram test was beyond the scope of the trial court's order and, thus, improper. However, defendant was not prejudiced by the impropriety.

### III.

■■■ It is argued that defendant's constitutional rights were violated by not being notified of the psychiatric examination. Several courts have held that an accused and his counsel are entitled to adequate notice, either on the basis of the sixth amendment or principles of basic fairness. (*Schantz v. Eyman* (9th Cir. 1969), 418 F.2d 11, *cert. denied*, 397 U.S. 1021, 25 L. Ed. 2d 530, 90 S. Ct. 1259; *United States v. Driscoll* (2d Cir.

1968), 399 F.2d 135.) We agree. Notice gives a defendant an opportunity to consult with his lawyer before the examination, and thereafter intelligently and informedly respond to a psychiatrist's questions. At the very least, a prior consultation with counsel will help ease the fears of an understandably apprehensive defendant. Also, counsel may be able to advise defendant of certain procedural alternatives. For example, in Illinois a defendant who intends to raise the affirmative defense of insanity may refuse to cooperate in a court-ordered psychiatric examination. However, he is then precluded from offering expert evidence or testimony tending to support the insanity defense if the expert's evidence or testimony is based upon the expert's examination of defendant. Ill. Rev. Stat. 1971, ch. 38, par. 115—6.

■■ The problem with defendant's notice argument is that he was given adequate notice, if not exact notice of the time and place of the examination. The State moved for the examination on August 14, 1973. After hearing argument from both the State and the defense, an order was entered on August 16, 1973, which provided for examination by Dr. Reifman "on August 23, 1975 or on any date subsequent, necessary to complete such examination." Defendant was examined on August 24, 1973. Thus, defendant had adequate time to consult with his attorney and prepare for the examination. No prejudice resulted from the examination taking place one day after the first day specified in the order. This was not a secret interrogation of defendant.

## IV.

■■ Defendant next maintains that he was not proved guilty beyond a reasonable doubt. Insanity is an affirmative defense. Unless the State's evidence in its case-in-chief raises the issue of insanity, the defendant must present some evidence to raise the defense. (Ill. Rev. Stat. 1971, ch. 38, par. 3—2.) Our supreme court has recently interpreted a defendant's burden to present some evidence to mean evidence sufficient to raise a reasonable doubt of sanity at the time of the commission of the offense. The burden then shifts to the State to rebut the defense by proof beyond a reasonable doubt. *People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321; *People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.

■■ Defendant in the instant case presented sufficient evidence to raise a reasonable doubt as to his sanity at the time of the commission of the offense. The reasonable doubt was established by the irrational nature of the killing itself, by the evidence of defendant's unsavory family life with a drunken father who beat and threatened defendant, by the evidence that the killing took place on the anniversary of the death of defendant's mother, for whom defendant had an unusually strong attachment, by the evidence of repeated drug usage, taken together with

the expert evidence testimony of the defense psychiatrist, Dr. Ziporyn, who testified, in response to a hypothetical question which described the background and behavior in evidence concerning defendant, that in his opinion the hypothetical man was suffering from a mental defect on the date of the killing and lacked substantial capacity to conform his conduct to the requirements of the law. Although each of these factors taken alone may be insufficient to raise a reasonable doubt of sanity (for example, the irrational nature of the killing, *People v. Lowhone* (1921), 296 Ill. 391, 129 N.E. 781, or the drug usage, *People v. Hunter* (1st Dist. 1973), 14 Ill. App. 3d 879, 303 N.E.2d 482), we think the evidence, taken as a whole, was sufficient to shift to the State the burden of proving sanity beyond a reasonable doubt.

We also think that the State, in rebuttal, sustained its burden of proving sanity beyond a reasonable doubt. Miss Suchy testified that, on the date of the killing, defendant forcibly entered her apartment and began to disrobe her until he observed the rib belt she was wearing to protect her broken ribs. She asked him not to rape her and he agreed. However, he did steal a rifle and some money from her. His comment to her before leaving, "But I did hurt you, I hurt your pride and your self-respect and your pocketbook," showed defendant understood that he was committing a crime. His decision to not rape her demonstrated a capacity to conform his conduct to the requirements of the law. Sergeant Cherry's testimony that defendant had no disciplinary problem while in the penitentiary further demonstrated that defendant was capable of understanding and obeying rules of order.

■■ Dr. Reifman testified that, in his expert medical opinion, defendant suffered from a personality disorder known as antisocial personality. Personality disorders are not mental defects within the statutory definition of insanity. (*People v. Williams* (1967), 38 Ill. 2d 115, 230 N.E.2d 224; *People v. Lono* (1st Dist. 1973), 11 Ill. App. 3d 443, 297 N.E.2d 349.) Reifman further testified, in response to a hypothetical question which incorporated the background and behavior in evidence concerning defendant, that the hypothetical man was not suffering from a mental defect or disease, had substantial capacity to appreciate the criminality of his conduct, and had substantial capacity to conform his conduct to the requirements of the law.

■■ It is the function of the trial judge, in a bench trial, to judge the credibility of the witnesses and determine what weight their evidence is entitled. This general principle of law holds true where the accused raises the defense of insanity. (*People v. Lono.*) The able and experienced trial judge stated, after considering and weighing the totality of the evidence, he was left with no reasonable doubt that defendant was legally sane at

the time of the commission of the offense. This finding is amply supported by the evidence and will not be disturbed on review by this court.

## V.

Defendant's final contention is that the sentence of 100 to 300 years imprisonment is excessive. It is argued that the sentence is not consistent with the purpose of article I, section 11 of the Illinois Constitution which provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Defendant asks this court, in view of his youth (22 years old at the time of the offense) and the possibility of rehabilitation, to exercise its authority to reduce the sentence under Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1971, ch. 110A, par. 615(b)(4)).

██ The sentence imposed is clearly within the statutory limits. (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(b).) This court's authority to reduce a sentence which is within the limits prescribed by the legislature should be applied with considerable caution and circumspection. (*People v. Minefee* (1st Dist. 1973), 14 Ill. App. 3d 796, 303 N.E.2d 591.) It should be exercised only where the sentence is clearly disproportionate to the nature of the offense of which defendant was convicted. (*People v. Smith* (1st Dist. 1972), 9 Ill. App. 3d 195, 292 N.E.2d 128.) A reviewing court is not empowered to substitute its judgment for that of the trial court. (*People v. Roper* (1st Dist. 1971), 133 Ill. App. 2d 910, 272 N.E.2d 667 (abstract), *cert. denied*, 405 U.S. 922, 30 L. Ed. 2d 794, 92 S. Ct. 961.) The imposition of sentence is peculiarly within the discretion of the trial court, for the trial court has a superior opportunity in the course of the trial and hearing in aggravation and mitigation to consider the various factors involved in the imposition of a sentence. Absent an abuse, the reviewing court should defer to the trial court's determination. *People v. Hanserd* (2nd Dist. 1970), 125 Ill. App. 2d 465, 261 N.E.2d 317; *People v. Bargus* (1st Dist. 1974), 18 Ill. App. 3d 916, 310 N.E.2d 777.

Defendant has an extensive prior criminal record of felony convictions. In June of 1968, defendant was convicted of burglary and grand theft. He was sentenced to five years probation with the first year to be served in the House of Correction. While on this probation, in June of 1969, defendant was convicted of battery and sentenced to six months imprisonment at Vandalia. Again while on probation, in February of 1971, he was convicted of robbery and three charges of burglary. Upon a plea of guilty, defendant was sentenced to two to eight years in the Illinois State Penitentiary. The original five-year probationary period was revoked and terminated and he was also sentenced to a concurrent sentence of two to four years. In May of 1972, defendant was released

from the penitentiary on a three-day furlough. Defendant violated this privilege and failed to return. The killing involved in the instant case occurred during this latter period.

The trial court, after presiding over aggravation and mitigation proceedings which included a presentence investigative report, accepted the State's recommendation for sentence. The following statement was made by the trial court at the time of sentencing:

"Here we have a crime of the most heinous kind, particularly vicious one. It's an unprovoked, motiveless, cold blooded absolutely senseless killing of a young boy who was fishing in Schiller Woods and at the time and under circumstances if you can use an adjective which was used by both the prosecution and the defense which is shocking indeed to the social conscience.

Giving full regard to the nature and circumstances of the offense and the character and history of the defendant it is clear to this Court that a minimum or a light sentence is unthinkable but rather that in this case represents an instance where a maximum sentence should and must be imposed.

* * *

In the light of the foregoing and giving full regard to the nature and the circumstances of the offense and the character and the history of the defendant this Court finds that the recommendation or the recommended sentence in this case is not unwarranted or disproportionate and therefore, Raymond Larsen, it is the sentence of this Court that you be confined to the penitentiary for a period of not less than one hundred nor more than three hundred years and you are hereby committed to the custody of the Illinois Department of Corrections."

■■ The trial court had the advantage of being able to observe defendant at trial. It was in the best position to evaluate the likelihood of defendant's rehabilitation. We conclude the trial court did not abuse its discretion. The sentence imposed is not disproportionate to the offense of which defendant was convicted.

For the reasons herein stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and PERLIN*, JJ., concur.

---

* At the time of oral argument of this case Justice John C. Hayes sat with Justices Downing and Stamos. Subsequently Justice Hayes died. Since that time Justice Perlin was designated the third member of the panel and has listened to the tape of the oral argument, has read the brief and excerpts from the record.