THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SIMON PETER NELSON, Defendant-Appellant.

Second District    No. 79-254

Opinion filed December 26, 1980.—Rehearing denied January 28, 1981.

WOODWARD, J., dissenting.

Mary Robinson and Mark Schuster, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Barbara A. Preiner, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

In a jury trial, defendant, Simon Peter Nelson, was convicted of the murders of his six children. The jury was unable to reach a decision on whether to impose the death penalty. He was sentenced to 100 to 200 years' imprisonment on each of the six counts, the sentences to run concurrently.

Defendant raises seven issues on appeal, five of which involve his defense of insanity at the time of the commission of the offenses. Such facts as are pertinent and necessary to the resolution of the case follow and additional facts are included in the discussion of certain issues.

The defendant and his wife, Ann, were the parents of six minor children. Defendant's lack of "family orientation" and Ann's involvement with another male precipitated marital problems which had been the subject of much discussion and concern during the latter part of December 1977 and the first week of January 1978. It was decided that Ann should "get away" for a few days; on January 5, 1978, defendant saw her off on her trip to Milwaukee; the next day defendant called her a couple of times, and later in the day Ann called one of defendant's attorney friends and told him she wanted a divorce; the attorney friend advised the defendant of this conversation and suggested a temporary separation as a possible solution. Defendant went home, packed his belongings and made numerous calls to relatives and to Ann. During the early morning hours of January 7, 1978, he killed all six of his children with a rubber mallet and a large hunting knife. He then drove to Milwaukee to the hotel where Ann was staying and told her he had killed the children. After he physically abused Ann, her male friend, who was present, called the police, who subdued and arrested the defendant; he was charged with murder; he waived extradition and was taken to the Winnebago County jail on the same day, namely, January 7, 1978.

On January 9, 1978, counsel was appointed to represent the defendant, who was indicted by the grand jury. On the same day, officials of the county jail requested the State's attorney to have defendant examined in

reference to "potential suicidal tendencies." An assistant State's attorney left directions for Dr. Carl Hamann, a psychiatrist, to go to the jail and examine defendant for this purpose. Later the same day, Dr. Hamann went to the jail and had been talking to defendant for 20 to 30 minutes when defendant's appointed counsel came to the jail to interview the defendant; counsel thereupon terminated Dr. Hamann's interview.

On January 20, 1978, the State filed a motion pursuant to section 115—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 115—6) to compel defendant to submit to an examination by Dr. Hamann, the same psychiatrist who talked to him on January 9, 1978, at the county jail. On January 27, 1978, defendant filed a motion to prohibit the employment of Dr. Hamann by the State for the reason that he had interviewed defendant on January 9, 1978, in violation of defendant's right to remain silent and to have counsel present while being interrogated. The trial court denied defendant's motion, granted the State's motion, and appointed Dr. Hamann.

For nearly four months defendant stated that he had no memory of anything that occurred from midnight until about 6 a.m. on January 7, 1978 (the interval during which the six children were killed). After at least eight meetings with Dr. Lawrence Freedman, a psychiatrist retained by the defendant, defendant broke through his amnesia and he was able to recount the events and his activities on the night in question. At the trial, defendant took the stand; his counsel specifically directed him to repeat what he had already related to Dr. Freedman, Dr. Hamann and Dr. Cavanaugh; defendant related to the jury his account of the critical events which largely conformed to the testimony later given by the psychiatrists.

At the trial, Dr. Freedman testified in detail concerning defendant's relationship with his parents, his wife, and business associates; he considered that his wife's impending divorce suit was critical; that defendant was subjected to stress after stress during the 10 days prior to January 6, 1978, and that the telephone calls on the final night were more and more frantic and stressful, especially the last call to his wife when he was totally rejected; that it was his opinion that defendant at the time of the killings had a psychosis, reactive confusion—acute confusional state; and that this mental disease or defect deprived defendant of the substantial capacity to either appreciate the criminality of his conduct or conform his conduct to the requirements of the law. He based his opinion on 30 hours spent with defendant, his review of tapes on those sessions, on psychological tests given the defendant, on police reports and reports of defense attorneys of interviews with at least 60 persons who were able to detail various parts of defendant's history and background.

Dr. Hamann testified at the trial for the State; he had conducted 12 separate question and answer interviews with defendant, including the

one on January 9, 1978; he found no evidence of a major mental disease or defect which would result in defendant's lack of substantial capacity to appreciate the criminality of his conduct or to conform to the law. In addition to the interviews, he based his opinion on investigative reports of the incident and psychological tests administered to the defendant. Finally, Dr. Hamann stated that one could not be legally insane unless he suffered from a major mental illness. On cross-examination he said that he had first concluded this after his interview of January 9; and the later interviews confirmed this.

Dr. James Cavanaugh was also appointed by the court to examine the defendant pursuant to the State's request and examined the defendant on May 5, 1978. His interview took some 2½ hours. Dr. Cavanaugh also concluded that Nelson was not insane at the time of the incident. Cavanaugh believed this was a "revenge murder." He believed that Nelson "became enraged and wanted to strike out and wanted to get back at Ann in the most primitive and hurtful way he possibly could." Cavanaugh believed that Nelson decided that killing the children was the "most horrible way to do this." Cavanaugh was impressed with the goal-directed and apparently methodical nature of Nelson's actions on the night in question. Dr. Cavanaugh considered the psychological tests, the police reports, his own interview with Ann Nelson, and Dr. Freedman's diagnosis in arriving at his conclusion. He believed that Dr. Freedman's diagnosis was "totally inconsistent" with the facts in this case. Cavanaugh also stated that he found no major psychiatric illness syndrome in the facts of Nelson's background and that he did not believe that Nelson was in need of psychiatric treatment as of the day he interviewed him, May 5, 1978.

Dr. Roger Mick, a clinical psychologist, described the battery of psychological tests he administered to Nelson before trial. Also, over objection, Dr. Mick told the jury that in his opinion Nelson was not suffering from any mental illness or defect to any substantial degree which would impair his ability to conform his behavior to the law or to understand the law.

On appeal, defendant contends that:

(1) The appointment of Dr. Hamann as an examining psychiatrist for the State enabled Dr. Hamann to give testimony at trial based upon the January 9, 1978, interview with defendant in violation of defendant's right to remain silent and to have counsel present.[1]

---

[1] Defendant also contends that he is entitled to a psychiatrist-patient privilege as provided in section 5.2 of "An Act in regard to evidence and depositions" (Ill. Rev. Stat. 1977, ch. 51, par. 5.2) as to any communications with Dr. Hamann on January 9, 1978. The State points out that defendant's failure to raise this issue in the trial court waives this issue on appeal and also resulted in a waiver of the privilege. We agree that the issue was not properly raised in the trial court, and do not consider it.

(2) The State violated the disclosure order of the court by failing to advise defendant's counsel that it had evidence that defendant had recently read the book Anatomy of a Murder; and that evidence admitted at trial that defendant had recently read the book Anatomy of a Murder was irrelevant and prejudicial.

(3) A clinical psychologist was erroneously permitted to give an opinion as to defendant's sanity at the time of the offense.

(4) The jury should have been instructed as to the consequences of a verdict of not guilty by reason of insanity.

(5) The court refused to permit the jury to hear tape recordings made at the time defendant broke through his amnesia as to critical events.

(6) Jurors were excluded in the selection process resulting in his conviction by a conviction prone jury.

(7) The sentence imposed was excessive.

The first error asserted by the defendant involves the appointment at the State's request of Dr. Hamann for the purpose of making a psychiatric examination of the defendant as provided in section 115—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 115—6). This appointment was made over defendant's objection that Dr. Hamann was, in effect, disqualified to make this examination by reason of the January 9, 1978, interview with defendant, which was allegedly in violation of the defendant's right to remain silent and to have counsel present. It is defendant's position that this error greatly prejudiced his defense because Dr. Hamann subsequently testified at the trial for the State and, in part, based his opinion as to defendant's sanity on the January 9 interview. In response, the State has argued that regardless of Dr. Hamann's earlier interview, the trial court had no discretion in appointing him to examine the defendant regarding his sanity, since the governing statute provides that "* * * the Court shall, on motion of the State, order the defendant to submit to examination by at least one psychiatrist, to be named by the prosecuting attorney." (Ill. Rev. Stat. 1977, ch. 38, par. 115—6.) While this language appears to make it mandatory that the court appoint the psychiatrist the State designates, we do not believe that the statute should be so construed as to preclude the court from rejecting the State's nominee after objection by defendant, provided that there is a showing that such an appointment would infringe on his constitutional rights. To do so would be to apply an unconstitutional interpretation to the statute.

■■ The critical issue, in our view, is whether communications of an accused in the course of a mental examination which bear on the issue of sanity, but not on the question of whether the defendant committed the crime charged, are "testimonial" evidence within the scope of the fifth

amendment privilege against self-incrimination. (See *Schmerber v. State of California* (1966), 384 U.S. 757, 760-65, 16 L. Ed. 2d 908, 914-17, 86 S. Ct. 1826, 1830-33.) While we recognize that the authorities are divided on this issue, we conclude that the more persuasive view is that communications relating only to the insanity defense are not constitutionally protected.

In *United States v. Cohen* (5th Cir. 1976), 530 F.2d 43, the defendant contended, as this defendant does, that since insanity negates an element of the crime, a court-ordered psychiatric examination, although solely to determine the accused's mental condition at the time of the offense, violates the privilege against self-incrimination. The court rejected the argument, noting that the examination does not determine guilt but the capacity to be guilty (530 F.2d 43, 47 n. 10); and held that since any statement made about the offense itself could be suppressed, the remaining communications were analogous to the required furnishing of "handwriting exemplars * * * and similar procedures." (530 F. 2d 43, 48.) The court further concluded that rather than a per se rule which would "prevent no threatened evil" and would deprive the State of, usually, the only satisfactory method of meeting defendant's proof on the issue of sanity, the use of the testimony should be balanced against the total exclusion of the examination.

*Cohen* relied upon *United States v. Albright* (4th Cir. 1968), 388 F.2d 719, which reached a similar conclusion. In *Albright* the court noted:

> "The maintenance of a 'fair state-individual balance' clearly required that the government be permitted to have defendant examined. Once defendant offered some evidence that he was not sane, the burden of proving legal sanity was on the government. [Citation.] Where a defendant is indigent and claims reason to doubt his sanity, the government stands ready to supply him with the services of psychiatric experts necessary to his defense. * * *
>
> It follows, also, that if the government is required 'to shoulder the entire load,' it cannot be denied access to the only reliable means of ascertaining the truth concerning a defendant's sanity." 388 F.2d 719, 724.

In *Pope v. United States* (8th Cir. 1967), 372 F.2d 710, 720, the court noted:

> "Certainly, the criminal trial is still a search for truth subject, of course, to constitutional guaranties. It would be a strange situation, indeed, if, first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense and, second, if the government is to have the burden of proof, as it does with the competency issue in the case, *Davis v. United States*, 160 U.S. 469, 486, 488, 16 S. Ct. 353, 40 L. Ed. 2d 499

(1895), and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which perhaps is the most trustworthy means of attempting to meet that burden."

See also *People v. Martin* (1971), 386 Mich. 407, 426-27, 192 N.W.2d 215, 225-26; *State v. Whitlow* (1965), 45 N.J. 3, 210 A.2d 763.

While we have not found an Illinois case directly in point, we believe that several of the decisions in this State imply a similar view. In *People v. Williams* (1967), 38 Ill. 2d 115, 121, the Illinois Supreme Court noted that trial testimony of psychiatrists, who have examined the accused in connection with pretrial competency hearing as to statements made by the accused relevant only to the sanity defense, did not involve "testimonial compulsion." Similarly, we have previously held that testimonial compulsion was not involved in statements made to a psychiatrist limited to sanity. *People v. Ehrler* (1969), 114 Ill. App. 2d 171, 180. See also *People v. Larsen* (1977), 47 Ill. App. 3d 9, 22.

The defendant, prior to trial, filed a motion to prohibit the State from employing Dr. Hamann as a psychiatrist on behalf of the State because to do so would "allow him to use material which was obtained in violation of Defendant's constitutional rights to remain silent and have counsel represent him while being interrogated." For the reasons given we do not agree that defendant's constitutional right to remain silent was violated. We also do not agree that defendant had a sixth amendment right to have counsel present. The Illinois Supreme Court has held that a pretrial psychiatric examination is not a "critical stage" of prosecutorial proceedings which would give rise to a constitutional right to presence of counsel. *People v. Larsen* (1979), 74 Ill. 2d 348, 353.

In his trial testimony Dr. Hamann stated that he first saw the defendant on January 9 for about 20 minutes, that he had "over a dozen" interviews with him in total, and essentially did not discriminate between statements and observations made in any particular visit. He did, however, state his impressions of defendant at the first interview were that "he was quite—he seemed depressed and tense and generally quite cheerful, * * *." On cross-examination he said he saw no evidence from his first interview that defendant was suffering from a major mental illness. He admitted he relied on the interviews in reaching his ultimate opinion as to defendant's sanity. Also, defendant related essentially the same facts in all further interviews with all other psychiatrists, including his own.

The fact that the initial visit by Dr. Hamann was not under the court's direction, in our view, does not distinguish the cases which we have cited, inasmuch as this would not bear on the issue of whether testimonial compulsion is involved contrary to the constitutional safeguard.

We are mindful of the fact that Dr. Hamann's initial visit was not under the direction of the court contrary to a statutory provision,

however. (Ill. Rev. Stat. 1977, ch. 38, par. 115—6.) While the defendant has not raised this specific objection, we consider whether there is plain error in the circumstances. We conclude that there is not.

The obvious purpose of the statute is to afford notice to protect the defendant's right not to incriminate himself as to the crime charged. The statute should be followed, and a deliberate subterfuge by the State might well call for a new trial on basic principles of fairness. We find no egregious action by the State in the circumstances of this case which calls for reversal, although there was no notice. There is no showing that the examination of the defendant shortly after after the crimes were committed was a part of the State's plan to secure an advantage in meeting a possible insanity defense. The initial visit was a result of a jailer's concern that defendant might commit suicide and the subsequent call by an assistant State's attorney to the doctor in that connection. It is noteworthy that defense counsel also had defendant examined by a different psychiatrist on January 14 due to similar concerns. While there may be cases in which the lack of notice may be a ground for reversal, we conclude that this is not such a case.

There are two additional reasons why reversible error did not occur here. First, the only specific mention made by Dr. Hamann on the January 9 interview concerned defendant's demeanor, which is not within the fifth amendment privilege. (*United States v. Wade* (1967), 388 U.S. 218, 87 S. Ct. 1926.) Second, even if evidence was unconstitutionally obtained on January 9, the record indicates that the same evidence was properly obtained later and testified to by both State and defense witnesses, making any error harmless.

■■ Defendant next asserts error when the State was permitted to cross-examine the defendant by establishing that he had read the book Anatomy of a Murder; that this cross-examination sought to impeach defendant's testimony relative to his state of mind because he knew the book was a fictional account of the murder of a tavern owner by the husband of a woman the owner had battered and raped; and that the defense asserted by the husband was a state of "dissociative reaction." Although defendant's recollection of the book was initially not very good, after the prosecutor read a brief passage from a copy of the book, defendant specifically remembered that the psychiatric description of the condition was "dissociative reaction."

Defendant first claims that this evidence had no relevance to the issues in this case, especially when the fictional facts in the book are compared to the situation presented here. Defendant's objection is chiefly a challenge to the weight to be accorded to the evidence; this is for the jury. Any circumstances may be placed in evidence which tend to make a point in issue more or less probable. (*People v. Peter* (1973), 55 Ill. 2d 443,

459.) The testimony here would logically tend to show a possibility that defendant had fabricated his insanity defense, especially in light of the initial diagnosis by defendant's psychiatrist that defendant was suffering from what had at one time been called "dissociative reaction." We accordingly hold that this testimony regarding Anatomy of a Murder was relevant. We also do not find that the possible prejudice to defendant arising from the book's title outweighed its probative value. *People v. Monroe* (1977), 66 Ill. 2d 317, 323.

Secondly, defendant asserts that the State deliberately failed to disclose evidence that was prejudical to the defendant and that said non-disclosure violated the court's discovery order. The evidence involved in this assertion was the use of the book in the cross-examination of defendant; the rebuttal testimony given by Ann Nelson that she had observed the defendant reading Anatomy of a Murder on December 26 or 27, 1977, at which time he was about two-thirds through the book; and that after New Year's Day, 1978, she again observed defendant reading the same book and he was about one-fourth the way into the book, thereby implying a second reading. This evidence was presented by the State for the purpose of impeaching the defendant's testimony as to when he read Anatomy of a Murder.

The background for defendant's charge of deliberate nondisclosure of the above testimony of Ann Nelson is as follows: On January 20, 1978, defendant presented a motion for discovery; on January 27, 1978, defendant presented a "motion for additional discovery" calling for the names and statements of rebuttal witnesses and an opportunity to examine tangible evidence including books intended for use in rebuttal. In response, the State delivered four different statements of Ann Nelson taken by various police officers at various times; also, the State responded to the motion for rebuttal information that identities of witnesses were "presently unknown"; defendant's attorney examined the State's physical evidence, which did not include the book, on March 29, 1978. On May 4, 1978, a week before trial, defendant's counsel at a pretrial conference advised the court that Ann Nelson had refused to talk to him, and the court advised the State to furnish any oral statements of witnesses that they were aware of.

On May 9, 1978, defense counsel orally advised the court and the State that insanity would be the defense and that the preliminary diagnosis of the psychiatrist was that defendant was suffering from hysterical neurosis, dissociative type. After the court appearance on May 4, the only response received by the defendant from the State was a photocopy of three sheets of notes made during an interview with Ann Nelson; there was no mention of Anatomy of a Murder.

The defendant contends that the State had a continuing obligation

under Supreme Court Rule 412(a) to provide the names of rebuttal witnesses and the substance of their testimony; that the disclosure by the defendant of his insanity defense immediately triggered a duty on the State to respond again to the previous discovery motions of the defendant; that the State failed to disclose its intent to use the testimony of Ann Nelson about Anatomy of a Murder in rebuttal.

The State's reply to the defendant's position is that it was not "formally" advised of the insanity defense until May 9, 1978, and that the particular information of Ann Nelson here in question was never reduced to writing and hence there was no duty to disclose it. Pursuant to Supreme Court Rule 412(a), there is a continuing obligation to provide discovery in reference to rebuttal evidence. Here, the State was aware of the likelihood of an insanity defense when it requested the court to appoint Dr. Hamann to examine defendant in January 1978; the refusal of Ann Nelson to talk to defense counsel should have alerted the State to take extra precautions to disclose any testimony of Ann Nelson that might be used, particularly after the court's pronouncement at the May 4 pretrial conference. Thus, the State should have disclosed its intention to use the book on cross-examination of defendant and to call Ann Nelson as a rebuttal witness, together with a specific summary of her testimony. The failure to comply with discovery, however, did not prevent a fair trial on this record.

The inquiry as to Anatomy of a Murder first surfaced in the cross-examination of the defendant. Defendant stated that he had read many books during the Christmas-New Year's period. The defendant acknowledged that they owned Anatomy of a Murder but did not think he had read it during that time. At this point defense counsel first objected, and on the ground of relevance, which was overruled. When the prosecutor began to read from the book, defense counsel objected to its use on discovery grounds for the first time. The court overruled the objection, and the prosecutor made several references to the temporary insanity defense referred to in the book including the use of the term "dissociative reaction" before asking defendant whether he had thought about what his defense would be when he killed his children, to which defendant answered "No." The answer apparently came at the same time defense counsel objected to the prosecutor's "theatrics." The court sustained the objection.

The State later put the defendant's wife on the stand in rebuttal. She testified, without objection, that she had seen her husband reading Anatomy of a Murder shortly after Christmas, that he was two-thirds through it, and that he had asked her to read it.

The goal of discovery, of course, is to eliminate surprise and unfairness and afford opportunity to investigate; and sanctions in aid of that purpose are to compel compliance with discovery orders. (See, *e.g.*,

*People v. Miles* (1980), 82 Ill. App. 3d 922, 926.) Exclusion of evidence, however, is a last resort, demanded only where a recess or a continuance woud be ineffective. (*People v. Rayford* (1976), 43 Ill. App. 3d 283, 288.) Here, the defense did not first claim surprise but objected only on relevancy grounds. When later reference was made to the violation of discovery, the defense made no request for a continuance.

■■ Generally, the failure to seek a continuance waives a claim of error based upon surprise. (*People v. Lee* (1980), 86 Ill. App. 3d 922, 938.) While the evidence that defendant had read the book may have had a definite bearing on the jury's response to the insanity defense, the prejudice was not because of the discovery violation. A continuance would have conceivably afforded defense counsel additional information from a reading of the book to pose further questions on grounds of the relevancy of the temporary insanity defense apparently related in the book, which may have lessened its weight. But it was the nature of the testimony which we have found to be relevant which disadvantaged the defendant. (See *People v. Cowherd* (1980), 80 Ill. App. 3d 346, 352.) By failing to seek the lesser sanction of a continuance and insisting on exclusion of the undisclosed evidence, defendant did not preserve his contention that he could have materially mitigated the harmful effect of the evidence had he been prepared to meet it. Defendant's contention on appeal as to how he would have rebutted the evidence[2] demonstrates that a brief continuance would have sufficed and that a "complete reorganization of the defendant's case" was not made necessary. *People v. Foster* (1979), 76 Ill. 2d 365, 384.

Our recent opinion in *People v. Weaver* (1980), 90 Ill. App. 3d 299, has been called to our attention in this connection. In *Weaver* we found the failure to follow discovery orders a ground for reversal among others. Here, the case was not close and the error, in context, not critical.

Defendant next contends that it was error to allow Dr. Mick, a clinical psychologist who administered various psychological tests to defendant, to give his opinion, based on his examination and testing, of whether defendant was sane as provided by statute. The Illinois Supreme Court has noted the definite trend to accept the opinion of properly qualified psychologists as to the existence and nature of mental diseases.

---

[2] Defendant maintains that there are significant factual differences between the insanity defense asserted in the book and his own situation, in that (1) the character in the book used an "irresistible impulse" defense, which is not available in Illinois, (2) the fictional character's dissociative reaction was brought on in part by his experience as a soldier in combat, unlike defendant, and (3) the fictional character was motivated by the victim's beating and rape of his wife, very unlike the facts in the instant case. Defendant also avers, contrary to the implication of the State, that the book is clearly not a manual on how to fabricate the insanity defense of dissociative reaction.

(*People v. Noble* (1969), 42 Ill. 2d 425, 434.) We conclude that Dr. Mick, as a qualified psychologist, was competent to testify as to his opinion of defendant's sanity. (*People v. Whitaker* (1980), 87 Ill. App. 3d 563, 567.) We note that the statute presently in effect confirms this result and believe that it has not changed the previous law. See Ill. Rev. Stat., 1979 Supp., ch. 38, par. 1005—2—5.

Defendant next contends that it was error not to instruct the jury on the consequences of a verdict of not guilty by reason of insanity. Although some Federal cases have allowed such an instruction, there are no Illinois cases which do. The instruction which defendant tendered was the following:

> "A person found not guilty by reason of insanity will be the subject of a commitment proceeding, which commitment will continue until it is established that the defendant is mentally able to return to society and not be dangerous to himself or other persons."

By its own terms, the defendant's proposed instruction infers by its language that defendant *will* be committed as a result of a commitment hearing. Inasmuch as this misstates the law, and as it would mislead the jury, the instruction was properly refused. We do not reach the question whether an instruction which accurately states the consequences of a not guilty by reason of insanity verdict should be given as a general rule. We note that *People v. Meeker* (1980), 86 Ill. App. 3d 162, decided that such an instruction should not be given.

Defendant next contends that because it was necessary for counsel to control defendant's demeanor while testifying so as to avoid an emotional outburst, it was error to refuse to permit the playing of either of two tape recordings made out of court of defendant describing the same events as in his testimony and which purported to portray his true emotional state. Inasmuch as counsel elected to proceed with a very controlled examination by his own choice, it is unknown whether defendant would have otherwise displayed the same emotions as are displayed on the out-of-court recordings, or whether such a display would have proved disruptive of the trial. Such a decision is simply a trial tactic which counsel should not later be allowed to disavow.

Defendant next contends that the seating of a "death qualified" jury (see *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770) is improper because it produces a jury biased in favor of a guilty finding. Defendant contends that when *Witherspoon* was decided, studies on this question were, as stated in the opinion, "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 517, 20 L. Ed. 2d 776, 782, 88 S. Ct. 1770, 1774-75.) He urges that recent research provides support for his position.

However, the Illinois Supreme Court has refused to consider the validity of the same studies cited by the defendant here and has held that the studies are not applicable in a case in which the issue is not guilt but whether the defendant was insane at the time of the commission of the offense. (*People v. Carlson* (1980), 79 Ill. 2d 564, 586.) We find no error here.

Finally, the defendant urges that his sentence is excessive. We disagree. The record fully supports the sentence within the court's proper exercise of discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149; *People v. Cox* (1980), 82 Ill. 2d 268.

Defendant's conviction and sentences are affirmed.

Affirmed.

UNVERZAGT, J., concurs.

Mr. JUSTICE WOODWARD, dissenting.

I must respectfully dissent from the holding of my esteemed colleagues in this case. The critical issue is whether or not a defendant's fifth amendment right against self-incrimination is protected as to communications to a psychiatrist designated by the State to visit him while incarcerated in the county jail, without having been appointed by court order and without notice to the attorney who had just been appointed to defend him. Such communications are so protected; defendant's right against self-incrimination was violated; and defendant accordingly should be granted a new trial.

To reiterate the essential facts, the defendant was charged with the murder of each of his six children on January 7, 1978; on the morning of January 9, he was arrested in Milwaukee, returned to Rockford and placed in the Winnebago County jail; he was indicted and counsel was appointed to represent him; on the same day the personnel at the jail became concerned about defendant's suicidal tendencies and notified the State's Attorney of this fact; the State's Attorney sent Dr. Carl Hamann, a psychiatrist, to the county jail to visit the defendant; Dr. Hamann visited the defendant in the jail and talked to him for at least 20 minutes, at which time the defendant's attorney arrived and terminated the interview.

On January 20, 1978, when it appeared to the State that the defense in this case would be insanity at the time of commission of the acts charged, the State insisted that the court appoint Dr. Hamann as its examining psychiatrist as provided by section 115—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 115—6). The defendant objected to the appointment of Dr. Hamann for the reason that he had interviewed and observed the defendant on January 9 in violation of the

defendant's fifth amendment rights. The court appointed Dr. Hamann as the State's psychiatrist over defendant's objection; thereafter, he had several additional interviews with the defendant. At defendant's trial, Dr. Hamann testified that, in his opinion, defendant was sane at the time of commission of the acts charged; he based this opinion in part on the January 9 interview that took place in the county jail as evidenced by the following cross-examination:

"Q: In fact, after seeing him on January 9th for, I believe, about 20 minutes, you formed your opinion at that time that he was not suffering from a major mental illness, did you not?

A. I did. I saw no evidence from that interview."

Dr. Hamann made the January 9 visit as an agent of the State's Attorney for the purpose of making an evaluation of the defendant's mental condition and suicidal tendencies. At that time, the defendant had the absolute right to refuse to submit to any examination as to his mental state by the State's psychiatrist as there had been no court order for the examination as prescribed by section 115—6. Nothing in the record discloses that defendant was advised that Dr. Hamann came there at the request of the State, nor was he advised that he had the right to remain silent or that he voluntarily and intelligently waived that right. At that time, by reference solely to the fifth amendment, defendant could refuse to incriminate himself as to his mental state or any other element of the crime charged.

A defendant gives up his fifth amendment rights during a psychiatric examination only when the examination is made according to the terms and conditions provided in section 115—6. In *People v. Larsen* (1977), 47 Ill. App. 3d 9, 361 N.E.2d 713, a court order was entered pursuant to section 115—6 for an examination of defendant's competency to stand trial, and his sanity at the time of the offense; the court held that the defendant's fifth amendment right was removed as to the State's psychiatrist. By reason of the January 9 interview and visit, Dr. Hamann obtained information which, together with other information and interviews with the defendant, culminated in his ultimate trial testimony, namely, that defendant was sane at the time he killed his children.

On January 20, 1978, at the time the State sought the appointment of Dr. Hamann as its psychiatrist, it was aware of his January 9 interview with the defendant. It is only reasonable to assume that at that time the State was aware that Dr. Hamann was then of the opinion that the defendant did not suffer from a mental disease or defect (an essential ingredient in arriving at an opinion that the defendant was insane at the time of commission of the crimes). By seeking Dr. Hamann's appointment, the State sought to exploit the advantage of the January 9 interview. Since Rockford is the second largest city in the State of Illinois, it is fair to

assume that there were other psychiatrists available to the State to conduct the necessary psychiatric examinations of the defendant. In fact, the State also had Dr. James Cavanaugh appointed pursuant to section 115—6; he also testified for the State. Dr. Lawrence Freedman testified that in his opinion defendant was insane at the time he killed his children.

In the trial of this case, the sole defense was insanity. This issue was sharply contested; expert witnesses with impressive credentials had differing opinions. The advantage gained by the State and the corresponding prejudice to the defendant by the subsequent appointment of Dr. Hamann and the importance of his January 9 interview is highlighted by the following portion of the State's closing argument to the jury:

> "* * * [W]hen you judge the insanity defense, ladies and gentlemen, you don't have to simply take what the psychiatrists say, as the psychiatrists sometimes make their examination sometimes months afterwards.
>
> Now, the defense psychiatrist didn't see the guy until three months after this occurred. He is trying to look back three months and determine how his mental state was for two hours three months ago.
>
> The prosecution psychiatrist was in a little better shape. Dr. Hamann saw him a couple days after he committed the crime."

Later, the State's Attorney again emphasized:

> "It is important that Dr. Freedman, I think, didn't see the defendant until some three months after the crime. Dr. Hamann, the prosecutor's psychiatrist who testified last, saw him right after the crime, I think, two days later."

Under the circumstances of this case, this argument afforded great weight and credibility to Dr. Hamann's opinion; on this basis, the prejudice to the defense in this case can hardly be questioned.

As previously stated, the issue here is whether a psychiatrist designated by the State may interview an incarcerated defendant, without *Miranda* warnings and without a court order, and use the information so obtained in testifying at trial as to the defendant's mental state at the time of the offense charged. In my view the majority completely ignore the necessity of *Miranda* warnings and sidestep the requirements prescribed by statute for a mental examination by a State-designated psychiatrist. In all Federal cases[1] cited by the majority, namely *Cohen, Albright* and *Pope*, the court ordered the psychiatric examination of the defendant *after* it was disclosed that insanity was the defense. In *People v. Williams* and *People v. Ehrler*, the psychiatric examination of the defendant was ordered by the court for the purpose of determining the defendant's

---

[1] Not all Federal courts agree. Contra, *United States v. Alvarez* (3rd Cir. 1975), 519 F.2d 1036.

competence to stand trial (Ill. Rev. Stat. 1967, ch. 38, par. 104—2(d)), and the psychiatrist making the examination was thereafter permitted to testify at the criminal trial. In *People v. Larsen*, the defendant disclosed his insanity defense; the court required the defendant to undergo a psychiatric examination by a State-designated psychiatrist. The defendant contended he was entitled to the presence of counsel at the examination in order to protect his fifth amendment right against self-incrimination. The psychiatrist testifying for the State examined the defendant first for the purpose of ascertaining his fitness to stand trial; later, he examined defendant to ascertain his sanity on the date of the crime charged. In a scholarly opinion, Justice Downing examined most of the cases dealing with the relationship of compelled psychiatric examinations and the privilege against self-incrimination. He discussed the cases cited above and concluded that most State and Federal courts, while holding either explicitly or implicitly that the fifth amendment right does attach, have nevertheless required the defendant to submit to a State psychiatric examination on the principle of estoppel or waiver after raising the defense of insanity. Applying this rationale to the facts of the instant case, there could have been no waiver or estoppel on January 9 when Dr. Hamann interviewed the defendant as he had not been arraigned on the charge of murder; the State in its brief concedes that the defendant's right against self-incrimination was in full force and effect when Dr. Hamann visited him at the jail; accordingly, he could refuse to incriminate himself as to his mental state as well as any other element of the crime charged.

The majority also reasons that a psychiatric examination does not violate the right against self-incrimination on the theory that it does not determine guilt but only the capacity to be guilty. This is difficult to accept, as the intent or knowledge of the defendant is an essential ingredient to be proved when the charge is murder; the defendant's mental state is a necessary element of the crime.[2] (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1; IPI Criminal No. 7.02.) Furthermore, defendant's words and acts on January 9, which led to Dr. Hamann's opinion that defendant was sane at the time he killed his children, certainly were inculpatory, as that opinion negated his only defense and resulted in a sentence of 100 to 200 years' imprisonment.

Another rationale used to avoid the recognition of the fifth amendment right is the so-called lack of "testimonial compulsion" in statements made to a State-designated psychiatrist attempting to ascertain defendant's sanity. The facts in the case of *People v. Wax* (1966), 75 Ill. App. 2d 163, 220 N.E.2d 600, shed some light on what might be considered "testimonial compulsion." There, a psychiatrist at the State's Attorney's request went to the jail to examine the defendant; he saw the defendant

---

[2] *United States v. Alvarez* (3d Cir. 1975), 519 F.2d 1036, 1042.

and asked his name; he identified himself as the State's Attorney's examiner; they looked at each other; there was no conversation for 20 minutes; the doctor asked the defendant if he had been in Army, Navy or Marine Corps; defendant shook his head to signify no; there was another interval of silence and then defendant asked the sheriff to get his attorney; the attorney arrived and there was no further examination. On appeal, the court stated that the presence or absence of the element of self-incrimination was a key factor; it concluded that the mutual observation by the doctor and defendant was, in fact, not testimonial compulsion as to inculpating matters. When the facts of *People v. Wax* are compared to Dr. Hamann's 20-minute visit with defendant on January 9, purportedly to render assistance and solace, it becomes apparent that the words and actions of the defendant were inculpatory, as Dr. Hamann then formed an opinion that defendant was not suffering from a major mental illness.

The majority indicates that the January 9 visit of Dr. Hamann is not reversible error because demeanor is not within the fifth amendment right, and further, because the defendant told essentially the same facts in later interviews which were properly authorized. This approach ignores the very nature of a psychiatric examination, which concerns the subject's words, expressions, tone of voice, nervousness and many other observable features. As stated in *Thornton v. Corcoran* (D.C. Cir. 1969), 407 F.2d 695, 699:

> "Unlike the realm of fingerprints and blood samples, there is at best small agreement among experts concerning either the theory or technique appropriate to the diagnosis of mental illness. The 'variable factors' are legion."

The necessity for a court order prior to a psychiatric examination pursuant to section 115—6 is inherent in the holding of *People v. Larsen*. In that case the order provided for a State-designated psychiatric examination and in addition thereto the defendant was given an electroencephalogram test which was not included in the court order. On appeal, the court stated that the results of the electroencephalogram test were improper and stated at page 28 as follows:

> "The electroencephalogram test conducted by Miss Twiggs and Dr. Gibbs was beyond the scope of the order. Thus, the statute regulating appointment of an electroencephalographer (Ill. Rev. Stat., 1971, ch. 38, par. 115—6) was not complied with."

As stated in the majority opinion, the Illinois Supreme Court has held that the defendant has no right to the presence of his attorney at a pretrial psychiatric examination. However, it is interesting to note that the defendant in *People v. Larsen* contended that his constitutional rights were violated because of the failure to give his attorney notice of the psychiatric examination; the court concluded that adequate notice had

been given and therefore the examination was proper. In discussing the notice question, the court made the following observation:

"Several courts have held that an accused and his counsel are entitled to adequate notice, either on the basis of the sixth amendment or principles of basic fairness. [Citations.] We agree. Notice gives a defendant an opportunity to consult with his lawyer before the examination, and thereafter intelligently and informedly respond to a psychiatrist's questions. At the very least, a prior consultation with counsel will help ease the fears of an understandably apprehensive defendant. Also, counsel may be able to advise defendant of certain procedural alternatives. For example, in Illinois a defendant who intends to raise the affirmative defense of insanity may refuse to cooperate in a court-ordered psychiatric examination. However, he is then precluded from offering expert evidence or testimony tending to support the insanity defense if the expert's evidence or testimony is based upon the expert's examination of the defendant. Ill. Rev. Stat., 1971, ch. 38, par. 115—6." (47 Ill. App. 3d 9, 28-29, 361 N.E.2d 713, 727.)

The foregoing statement would appear to be particularly applicable to the defendant's situation in this case as an attorney had been appointed to represent the defendant shortly before Dr. Hamann made his visit. In *United States ex rel. Wax v. Pate* (7th Cir. 1969), 409 F.2d 498, 499, the court stated:

"[I]t is better practice to give notice to counsel. Absent a showing of actual prejudice which is missing here, we conclude that failure to give notice did not render the trial constitutionally defective."

In this case the defendant has not claimed error for failure to give notice to his attorney of Dr. Hamann's proposed visit. As pointed out in the above quote from *People v. Larsen*, the importance of adequate notice to defendant's counsel, particularly in a case where the defendant is charged with six murders, must be considered mandatory on principles of basic fairness; as previously pointed out, it is believed that there is no question that defendant was prejudiced by the failure to give notice to counsel. Accordingly, this omission and the violation of the defendant's right against self-incrimination combined to create reversible error in this case.

It is my belief that if this court approves the appointment of Dr. Hamann as the State-designated psychiatrist on the issue of defendant's sanity, it will approve a practice with an unlimited potential for abuse. (See *Schantz v. Eyman* (9th Cir. 1969), 418 F.2d 11 (facts different but an example of the type of action that might be encouraged).) On the theory that a person charged with a serious felony has suicidal tendencies or other mental difficulties, the State will be encouraged to seek an immedi-

ate psychiatric examination of the defendant without notice to his attorney; this expert will be more creditable because of the proximity of this examination to the crime charged. The weight given this argument is conceded by the State in this case as they state in their brief:

"The People submit that closeness of the examination to the time of the crime was a legitimate factor to be considered by the jury and a proper subject for comment by the State."

The majority also find that the State should have disclosed to defense counsel its intent to use in rebuttal the testimony given by Ann Nelson about the defendant reading Anatomy of a Murder. The record reveals that defendant was cross-examined regarding Anatomy of a Murder as part of the defense's case in chief. Thereafter, three additional witnesses testified for the defendant, and then the State called in rebuttal its two psychiatric doctors and a psychologist before calling Ann Nelson to impeach the defendant's testimony regarding his reading of Anatomy of a Murder. The majority conclude that this failure of disclosure was error, but that it was not reversible error in that the defendant failed to seek a continuance and thereby waived any claim of surprise. At the time Ann Nelson was called in rebuttal, there was no indication as to what her testimony would be as there had been no disclosure to the defendant. To object after the question was asked would only have highlighted the importance of the book to the defendant's further disadvantage. For this reason a request by the defendant for a continuance would have been useless.

The majority finally dispose of the point relating to the failure to make the disclosure by stating: "The case was not close and the error, in context, not critical." As previously stated the insanity defense was sharply contested; this admitted error together with the issues previously discussed in this dissent are valid grounds for a new trial. The defendant in this case, who has admittedly committed the most heinous acts imaginable, is still entitled to the fundamental rights guaranteed by the laws of our State and the United States Constitution. I would reverse and remand for a new trial.