2026 IL App (4th) 250222

NO. 4-25-0222

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| IAN PARENTICE, | ) | No. 21DT708 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Philip J. Nicolosi, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1        In September 2021, the State charged defendant, Ian Parentice, with two counts of driving under the influence of alcohol (DUI), both Class A misdemeanors (625 ILCS 5/11-501(a)(1), (2) (West 2020)), as well as improper lane usage (*id.* § 11-709) and speeding (*id.* § 11-601). That same month, defendant requested discovery from the State, including full information regarding chemical testing.

¶ 2        In June 2023, the trial court entered an order barring the State from using any discovery tendered after that date. In February 2024, the court entered a written order directing the State "to provide the business record related to the accuracy checks related to the certified breathalyzer used in this case" by February 23, 2024. The State tendered those records on February 22, 2024.

¶ 3        Subsequently, in March 2024, the trial court denied defendant's first motion *in limine*, which sought to prevent the State from introducing the results of the certified breath test (CBT) at trial; then, in October 2024, the court granted defendant's second motion *in limine* to bar the results of the CBT, referring back to its June 2023 order as the basis for its evidentiary ruling. In February 2025, the court denied the State's motion to reconsider its October 2024 order granting defendant's second motion *in limine*.

¶ 4        The State appeals, arguing the trial court abused its discretion by barring the State from mentioning the CBT results at defendant's jury trial. We agree, reverse the trial court's judgment, and remand for further proceedings.

¶ 5                                    I. BACKGROUND

¶ 6                                    A. The Charges

¶ 7        On September 6, 2021, the State charged defendant with two counts of DUI, both Class A misdemeanors (*id.* § 11-501(a)(1), (2)), as well as improper lane usage (*id.* § 11-709) and speeding (*id.* § 11-601). The arresting officer, Trooper Joel Ekberg of the Illinois State Police (ISP), completed a "Law Enforcement Sworn Report," which was filed in the trial court, stating that he "observed a strong odor of an alcoholic beverage. [F]ield sobriety test revealed multiple clues of [i]mpairment. [Preliminary breath test] 1.62. [Blood alcohol concentration (BAC)] at the jail was [0].155."

¶ 8        B. The Pretrial Hearings and Discovery: September 2021 Through March 2022

¶ 9            1. *Defendant's Discovery Request and the State's Answer*

¶ 10       On September 10, 2021, defendant filed a motion for discovery, requesting, among other things, "[f]ull information concerning any chemical tests or tests that the Defendant submitted to at the request of [a] law enforcement officer, including but not limited to ***

[c]alibration logs for testing devices."

¶ 11    Later that month, the State filed an answer to defendant's request for discovery, disclosing, among other things, an "Intox Report" and "BAO [(breath analysis officer)] Certification-Ekberg."

¶ 12    2. *Defendant's Petition To Rescind*

¶ 13    On the same day defendant filed the motion for discovery, defendant also filed a petition to rescind the statutory summary suspension, arguing, in relevant part, that "the arresting officer did not have reasonable grounds to believe that the Defendant was *** driving under the influence of alcohol."

¶ 14    In October 2021, the trial court conducted a hearing on defendant's petition to rescind the statutory summary suspension. At the beginning of that hearing, defense counsel told the court that he had received "initial discovery in the form of a police report and a partial squad video," but he was "still waiting on the other part of the squad video and calibration logs from both the certified and portable breathalyzer test." Counsel asked that the summary suspension be rescinded pursuant to *People v. Patel*, 2019 IL App (2d) 170766 (holding that the failure to hold a hearing on a petition to rescind summary suspension within 30 days results in rescission). The State agreed.

¶ 15    Later that month, the trial court entered a written "agreed order," granting defendant's motion to rescind his statutory summary suspension "on the basis of the state's non-compliance [with] discovery pursuant to [*Patel*]."

¶ 16    3. *The December 2021 Pretrial Hearing*

¶ 17    In December 2021, the trial court conducted a pretrial hearing. Defense counsel stated that he was "still waiting on the calibration logs" for both the portable breath test (PBT)

instrument and the CBT instrument. Counsel asked to set a hearing for "status on discovery," which the court set for January 4, 2022.

¶ 18                                          4. *January 2022 Pretrial Hearing*

¶ 19          At the January 4, 2022, hearing, defense counsel stated that the State had advised him that "they do not have the logs for that [PBT]"; accordingly, counsel planned on filing a motion to suppress any PBT results. The State remarked, "[I]t's not that they don't have the PBT logs, it's that they don't keep PBT logs or records of those logs, so those logs don't exist ***." The following colloquy then ensued:

> "[THE COURT]: So, if and when they're calibrated, they don't keep track of that—because I don't see that very often, this particular issue with PBT logs, it just doesn't come up that often. So obviously, with [CBTs] you have to keep the logs [and] whatnot, but with PBTs they are calibrated though correctly—correct?
>
> [THE PROSECUTOR]: That would be my one question is, if we request calibration logs for the PBT, those might exist.
>
> THE COURT: And what are you, what are you talking about?
>
> [DEFENSE COUNSEL]: Judge, we were requesting calibration logs, I'm not sure what other logs there are.
>
> [THE PROSECUTOR]: Well, when we—PBT logs would be like the CBT logs where, you know, every single time someone does a PBT, they record the person—
>
> THE COURT: Okay.
>
> [THE PROSECUTOR]:—the date, the time, the result.
>
> THE COURT: So that's not what it sounds like they're looking for, they are

- 4 -

looking to see just whether or not they were tested and when; is that correct?

[DEFENSE COUNSEL]: That's correct.

[THE PROSECUTOR]: Okay. I think from what [defense counsel] had been requesting, it's the PBT logs, which some departments keep the logs of their PBTs.

[DEFENSE COUNSEL]: Okay.

THE COURT: You understand the distinction he's making?

[DEFENSE COUNSEL]: Judge, I understand the distinction. Whenever we request calibration logs, I've always just assumed that the State would turn over the calibration records and not necessarily what each individual role in the portable was.

THE COURT: *** [S]o I don't see a—was this registered as a—I don't see a BAC ticket, so was this registered as a refusal?

[THE PROSECUTOR]: There was a, there was a CBT.

THE COURT: Okay. And what were the alleged results of that?

[THE PROSECUTOR]: [0].155.

THE COURT: Okay. And then the CBT—or excuse me, the [PBT] then that's, I guess, relevant for probable cause or—

[DEFENSE COUNSEL]: Yes, Judge. We're challenging the probable cause from the arrest and part of that, or part of the evidence used for that arrest was the [PBT].

THE COURT: Okay.

[DEFENSE COUNSEL]: And administrative code indicates it has to be

calibrated every 93 days.

> [THE PROSECUTOR]: What I would suggest is a date for [defense counsel] to get the motion on file and then for—and then on that date we'll see if we have—have the calibration for the PBT. Because I think the ISP—what we requested was something different than what defense counsel was—
>
> THE COURT: Okay.
>
> [THE PROSECUTOR]:—looking for."

¶ 20    The trial court then set a "final pretrial conference" for January 18, 2022.

¶ 21                    5. *"Final Pretrial Conference"*

¶ 22    During the January 18, 2022, pretrial hearing, the parties discussed the status of discovery, and defense counsel made the following remarks:

> "I think discovery's otherwise complete, Your Honor. We have asked the State to look into to see if there was calibration logs for the portable breath machine available and I think there was a discussion at the last court date of whether or not those exist or not. So, depending on that answer, I think we may be filing a motion to suppress that evidence."

Defense counsel then requested another "pretrial conference/status" for March 2022.

¶ 23    The prosecutor responded that he had spoken with an ISP trooper, who told him "troopers do not keep logs for the PBTs." Defense counsel stated, "That's fine," and the trial court set the case for further hearing in March 2022.

¶ 24     C. Defendant's Motion To Suppress and Further Pretrial Hearings

¶ 25                    1. *Defendant's Motion To Suppress*

¶ 26    On March 1, 2022, defendant filed a "Motion to Quash Arrest and Suppress

Statements," alleging, generally, that Ekberg lacked probable cause to arrest defendant for DUI. As part of that argument, defendant asserted that the PBT administered prior to defendant's arrest "should not be considered in any probable cause determination" because section 1286.250 of the Illinois Administrative Code (20 Ill. Adm. Code 1286.250 (2011)) requires a "portable breathalyzer" to be calibrated every 93 days, and the State had revealed as part of discovery that "it does not keep testing logs for portable testing devices."

¶ 27 That same day, the trial court conducted the previously scheduled pretrial hearing. At the beginning of the hearing, defense counsel stated, "I do believe all discovery has been tendered. In the situation with the question of—there's an outstanding issue of the CBT logs, [the prosecutor] has informed me that he does have those, so it's just a matter of us getting a copy of those ***." Defense counsel then requested that his motion to suppress be set for hearing, adding, "I do not believe the outstanding CBT logs would be an issue for that hearing."

¶ 28 On August 17, 2022, the trial court conducted a hearing on defendant's motion to suppress. At the beginning of the hearing, defense counsel announced that he was ready to proceed but noted that he had just been handed the PBT test logs. Citing "local rules" requiring discovery to "be complete [by] the first court date after arraignment," counsel made an oral motion to exclude the PBT logs, asking that the court "not allow these logs into evidence."

¶ 29 The prosecutor responded that no legal basis existed to exclude the PBT logs, noting that the delay was due to a miscommunication. The prosecutor explained that his office had previously requested "[PBT] logs" from the ISP and was informed that those logs did not exist. The prosecutor later learned that defense counsel was actually seeking "certification logs" for the PBT device, which did exist. After realizing the difference, the prosecutor spoke directly with a sergeant from the ISP, who forwarded him the "certified calibration for the [PBT device] from

August [2021]."

¶ 30        Defense counsel disputed that a miscommunication had occurred, asserting instead that "it was very clear what we were seeking." Counsel noted that he had requested "calibration logs," and what he received was a "certification log." As a result, counsel concluded that both terms contain the word "log" and that "calibration" and "certification" are "synonymous."

¶ 31        The trial court stated that it was "loathe to exclude" the PBT logs because "the only prejudice that you have is that you might potentially have to have another hearing date." The court also questioned, "I mean, this is a misdemeanor DUI, there's no other alternatives between the parties?" While reviewing the record, the court noticed that the summary suspension had been rescinded based upon a lack of discovery; following that realization, the court stated, "I mean, you know, this is just really, really abysmal ***, discovery was outstanding and here we are now *** 10 months later and it's the same issue." The court then left the bench to conduct "some quick research." Upon returning, the court denied defendant's oral motion to exclude the "use of information in the PBT."

¶ 32        Defense counsel stated he would file (1) a motion to reconsider, asserting that he "substantially relied on the State's representation *** seven months ago that these logs didn't exist" and (2) a motion for sanctions. The trial court acknowledged that "things like this can be avoided" but observed that defendant's "ability to have a meaningful hearing" had not been thwarted.

¶ 33                           2. *Defendant's Motion To Reconsider*

¶ 34        In September 2022, defendant filed a motion to reconsider, asking the trial court to "reconsider its decision to allow in PBT logs that were tendered by the [S]tate minutes before a hearing on Defendant's Motion to Quash Arrest, Suppress Evidence, and Suppress Statements."

¶ 35　　　　In support of his motion, defendant alleged that (1) in September 2021, he filed a discovery request seeking "[c]alibration logs for testing devices," (2) in January 2022, "the State told the Defense that the [PBT] logs do not exist," (3) in reliance on that representation, defendant filed his motion to suppress evidence and statements, and (4) "minutes before the hearing was scheduled to [begin], the State tendered to the Defense the PBT logs." Defendant asserted that the State had acted in bad faith when it represented in January 2022 that the logs did not exist and also violated a local discovery rule requiring discovery "to be completed by the first status following arraignments." Defendant requested, therefore, that the trial court "reconsider its decision and bar the admission of the [PBT] logs and the [PBT] results."

¶ 36　　　　That same month, the State filed a response to defendant's motion to reconsider, arguing that defendant requested the production of a "calibration log," which is something that does not exist. The State also argued that defendant did not state how he was prejudiced by the disclosure of the "certification log" in August 2022.

¶ 37　　　　In June 2023, the trial court conducted a hearing on defendant's motion to reconsider. The court expressed frustration at how long it took to get the materials but noted that the materials had been provided. As a result, the court denied defendant's motion to reconsider.

¶ 38　　　　　　　　　　3. *The Trial Court's June 2023 "Sanction Order"*

¶ 39　　　　That same day, the trial court entered a written order, stating that "any additional discovery that is turned over by the State after today's date may not be used by the State but can be used by the Defense."

¶ 40　　　　　　　　　　D. Defendant's First Motion *in Limine*

¶ 41　　　　　　　　　　　　1. *The Motion*

¶ 42　　　　On February 8, 2024, defendant filed his "First Motion *In Limine*: (Motion to

Exclude Certified Breath Test).” In that motion, defendant asked that the CBT result be excluded at trial because the State could not lay the proper foundation. Specifically, defendant argued that the State had not disclosed (1) the identity of the officer who conducted the CBT or proof he was licensed or (2) “proof of any accuracy checks done for the [CBT] instrument.” Defendant asserted that, because (1) this foundational information had not yet been disclosed and (2) the trial court's June 2023 order prohibited the State from using any discovery tendered after that date, the court should further order that the result of the CBT be excluded at trial.

¶ 43        On February 15, 2024, the trial court conducted a pretrial hearing. In response to questions from the court, the prosecutor asserted that (1) he had provided standard misdemeanor discovery, (2) “only one or two people in the State do the certification for the breathalyzer machine, and that only becomes an issue once we go to trial and need that certification,” and (3) barring the State from laying the foundation for the CBT would be an “extraordinarily punitive measure.”

¶ 44        The trial court asked the prosecutor to suggest an alternative to barring the evidence, and the prosecutor urged the court to tender the materials to the defense in advance of trial. The court then asked whether the case was set for a jury trial date, and the parties replied that no date had yet been set.

¶ 45        The trial court passed the case to attend to other matters and “spend a little bit more time making a decision.” Upon returning its attention to this case, the court asked the prosecutor when he would be able to provide the certification logs to the defense, and the prosecutor replied, “by next week.” The court noted it was “trying to move this case along [but] not being very successful at it,” and it entered a written order directing the State to (1) “provide the business record related to the accuracy checks related to the certified breathalyzer used in this case” and

(2) "file a response to Defendant's [first motion *in limine*] by [February 23, 2024]."

¶ 46    2. *The State's Response to Defendant's First Motion in Limine*

¶ 47    On February 23, 2024, the State filed its response to defendant's first motion *in limine*, in which it advised the trial court that it had "produced the ISP accuracy certification checks to the defendant on February 22, 2024," consistent with the court's deadline. Citing *People v. Nelson*, 92 Ill. App. 3d 35, 45 (1980), the State argued that exclusion of evidence is a last resort and should be ordered only when a recess or continuance would be ineffective. In this case, the State contended, "to deny the State the use of the testimony of the breath test operator *** would prejudice the State and would be an abuse of the court's discretion."

¶ 48    3. *The Hearing on Defendant's First Motion in Limine*

¶ 49    In March 2024, the trial court conducted a hearing on defendant's first motion *in limine*. Defense counsel reiterated the arguments in his written motion, and the State advised the court that it had tendered the certification logs prior to the court's deadline. Defense counsel "acknowledge[d] receipt" but noted that materials were tendered "after the June 6 order" barring further discovery. The following colloquy occurred:

"THE COURT: "All right. So I, believe me, I know the frustration with the State's Attorney's Office and their discovery problems that they just cannot get a handle on, however, and I know I have addressed that by issuing, I don't know how many different types of orders, but technically the Court can always rescind an order, overrule itself, change it. How is the defendant going to be prejudiced if the State finally has gotten things to you, which it sounds like; is that correct or it's not correct?

[DEFENSE COUNSEL]: Yes, Judge, it is correct.

THE COURT: And it's not like the day of trial, which I've seen them attempt to do before. How is the defendant prejudiced at this point?

[DEFENSE COUNSEL]: Well, Judge, it's prejudiced because, one, it's been two and a half years, this is a 2021 case—

THE COURT: I get that, but I mean, results haven't gotten stale, it's not like it's a blood test where there's potential issues about contamination or chain of custody. And I don't know anything about this case, I really don't. I mean, I know we've had hearings, it's been so long. I know we had one a year ago—no, not a year ago, a year and a half ago. So, I don't know what the hang up is with the parties, but that's not my concern. It's up to the parties to figure out how they want to proceed. But, I mean, as long as the State can lay a proper foundation for the admission of the breath test results, the defendant has an opportunity to look at it prior to trial. I don't—what's the prejudice there? It's inconvenient, it's frustrating, but from a legal standpoint, once we take deep breaths and calm down, I don't— State, what's your position on this?

[THE PROSECUTOR]: Your Honor, just that these accuracy checks, from my understanding, are not tendered as part of routine discovery, they are tendered in advance of trial. And that the initial discovery issues, from my understanding and my review of the ROAs and the orders in this case, had to do with accuracy checks related to the PBT, and that your order, to that effect, barring further discovery by the State would be in—discretion, as I would understand it, Your Honor.

[DEFENSE COUNSEL]: And, Judge, you asked as to what the prejudice

would be, well, you did indicate a little bit of it, one, the frustration, it's not necessarily prejudice in terms of outcome, but it has been two and a half years on this one. So, any sort of delay that comes with that is simply delay in which my client can't necessarily make all decisions, whether it's setting it for motion to suppress, setting it for motion to sanction, setting it for trial at all without all of the information necessary, which is the purpose of discovery. The State's going to not turn that over until after. Technically, this had been set for trial, that had been on the final, final pretrial, one of the two dates before the trial in which I had filed that, so it had been set for trial when I filed that, and the State is not going to turn that over until afterwards. Well, my client had already set it for trial, and we made decisions based on information that—

THE COURT: Well, I get that, but the thing is, it didn't go to trial. I've had cases that have gone to trial that have raised this issue with the State, so—but in this particular case, the defendant has the time to prepare for trial as he sees fit, including any additional pretrial motions, motions to suppress statements, motions to suppress evidence at trial. He's not precluded from doing any of that. I've got cases in this courtroom that are five years old and it's not that uncommon, and I'm not blaming that all on the State. There's some cases that just neither side wants to move forward, and I don't get that, I never understood that.

But as long as the State can lay a proper foundation, as long as you've got all the information that they're going to try to use, then your client I don't find is really prejudiced as far as his due process rights to adequately prepare for trial and have a trial. So, I respectfully deny your motion. And, again, as long as the State

- 13 -

can file or lay a proper foundation without any further—just based on the delay, I'm going to deny the motion."

The trial court then set the case for "final pretrial" on June 13, 2024, "jury status" on June 24, 2024, and "jury trial" on June 25, 2024.

¶ 50                                    E. Defendant's Second Motion *in Limine*

¶ 51                                    1. *The Pretrial Hearing and Defendant's Motion*

¶ 52          On June 13, 2024, the trial court conducted a final pretrial hearing. Defendant filed *instanter* his "Second Motion *In Limine* (Prevent State from mentioning CBT result in opening/closing arguments)," which sought an order barring the State from "comment[ing] in opening, closing, or during questioning, what the certified breathalyzer result was." In support, defendant asserted, essentially, that because the State had not tendered (1) the identity or certification for the officer who administered the CBT and (2) the "accuracy checks that were conducted on the certified breathalyzer" prior to the trial court's June 2023 order preventing the State from using discovery tendered after that date, the State was barred from introducing that evidence at trial and would therefore be unable to lay the foundation for the admission of the result of the CBT.

¶ 53          After defense counsel requested a hearing date and the State responded that it believed the matter had already been litigated, the trial court remarked, "So, I mean this is very difficult to deal with on a felony status date, let alone this morning." (We note the record indicates that, in the middle of this hearing, the bailiff asked the courtroom occupants to "[p]lease evacuate" for an unknown reason.) After listening to back-and-forth from the parties about whether the matter had been litigated, the court stated as follows:

          "Okay. I guess then we'll set it for a hearing. *** So, we'll take it off the

trial call. You know, if the State would just learn how to turn over its discovery, it would alleviate a lot of problems. That's all I'm saying. It's an extraordinarily high volume, complicated courtroom, and the discovery issues are very problematic, and particularly when you're dealing with misdemeanor DUIs from three years ago, and we're still talking about what's being turned over, what's not being turned over. I think my hands are somewhat tied based on some of the case law that I've seen in regards to what type of sanctions I can give as far as—I mean, I know what I would prefer to do based on the routine that's been happening, but I think my hands are tied to a certain extent anyway.

So, I'm going to keep an open mind, and I'll listen to everybody's arguments on this matter, and I will pick a date."

The court then vacated the June 2024 trial date and set defendant's second motion *in limine* for a hearing on October 3, 2024.

¶ 54          2. *The State's Response to Defendant's Second Motion in Limine*

¶ 55          On June 28, 2024, the State filed a written response to defendant's second motion *in limine*, arguing that the trial court's denial of defendant's first motion *in limine* meant that the State would be allowed to introduce evidence and argument concerning the CBT. The State also argued that although it "does have an obligation to produce accuracy checks as a foundation for the [CBT] at trial, those certifications are not part of the State's routine discovery obligation and have never been requested prior to trial." The State further asserted that (1) on February 15, 2024, the court had ordered that the State had until February 23, 2024, to produce the accuracy check logs and (2) the State provided those logs on February 22, 2024. Last, the State argued that, if the court believed a discovery violation had occurred, the proper remedy was not the exclusion of

evidence but instead a continuance. The State asserted that the exclusion of the CBT "would prejudice the State and would be an abuse of the Court's discretion."

¶ 56                    3. *The Hearing on Defendant's Second Motion in Limine*

¶ 57          In October 2024, the trial court conducted a hearing on defendant's second motion *in limine*. The parties reiterated their positions in their written filings. In response to questioning by the court, both parties agreed that the State had disclosed the CBT calibration logs (also called "accuracy check logs" and "accuracy certification checks") to defendant on February 22, 2024. The State also contended that defendant's second motion *in limine* was "similar to defense motion *in limine* one, which was heard and denied."

¶ 58          The trial court then asked whether it had ruled on defendant's motion to reconsider the court's ruling denying defendant's first motion *in limine*. Defense counsel responded that he was "unsure." The court then stated as follows:

               "Well, so how was the defendant prejudiced if, if you have the information and you have it prior to trial, this case obviously is almost 3 years old? And I remember the frustration, there was a period of time where the State was having some issues with turning things over, not just in this case, in other cases, it was very frustrating. But the information was ultimately turned over prior to trial, you have them."

¶ 59          The trial court noted that, in March 2024, it had denied the first motion *in limine* seeking to exclude the CBT result and then observed that (1) the second motion *in limine* was duplicative of the first and (2) defendant had not shown prejudice. The court then stated as follows:

               "Well, the Court has the discretion to sanction or not sanction at all, and if the Court does issue a discovery sanction, which I did not [do] here, but if I were to do that,

I also have the further discretion of what type of sanction, you know, would that be, you know, from the one extreme of, you know, dismissing the case, to also on that end of the spectrum, you know, excluding the information. But when the information—and that was requested was ultimately turned over, to say, well, we just don't want you to do that because it just wasn't turned over in time, I just find that's kind of a spurious argument to a certain extent."

¶ 60          After further argument, the trial court again asked defendant how he was prejudiced by the State's late disclosure, and counsel answered that his client had been "coming back and forth to court for 3 years on a misdemeanor," and counsel had "rel[ied] on [the State's] representations that they don't have certain things."

¶ 61          Defense counsel then attempted to explain the difference between his first and second motions *in limine* as follows:

"[D]efendant's motion[s] *in limine* 1 and 2 are not mutually exclusive, so my understanding from denying the first motion *in limine* was basically just saying that the State can somehow get this foundational information in, then they can get that [CBT] in. Whereas our second motion *in limine* basically lays out all the reasons why the State's not going to be able to provide the foundational information for the [CBT], and they cannot use that in their opening arguments, we didn't say closing arguments, so if the State can somehow provide the foundation, which they're going to be able to do, then they can use that in their closing arguments, and they can get that into evidence, but we already have an order for sanctioning the State saying they cannot use that information. So, if they put that in their opening statement, it's going to severely prejudice my client. For the last year and change,

we have relied on this order moving forward for how we're going to handle this case."

¶ 62 The trial court inquired why the case had not been set for trial following its ruling in June 2023 prohibiting the State from using discovery tendered after that date and then examined the various reasons for continuing the case. During this review, the court noted that two different defense attorneys and six different prosecutors had "been on this case."

¶ 63 The trial court then asked the State for its position on the court's "apparently disparate" orders and "the noncompliance by the State *** for the first 19 months" before the court's June 2023 order. On this topic, the court also asked the State whether, irrespective of the fact that defendant received the discovery in February 2024, the court was "just supposed to look the other way and say, yeah, I know I entered that previous order, but I'm going to ignore that?"

¶ 64 The State responded that the June 2023 order came about due to the delay in turning over the PBT logs, not the CBT logs. The trial court responded that its June 2023 order did not state it applied only to the PBT logs.

¶ 65 The State also asserted that its common practice was to disclose the CBT logs after the case was set for trial because the logs were not part of its common discovery obligations. In response, the trial court asked, "What's the rationale for that, I mean, I guess I've never have heard that argument or practice before. And again, I'm sorry, where—what was the basis of that, or authority for you saying that you don't have to turn it over until trial?"

¶ 66 The State responded as follows: "[The] State would argue that the, that the results are, that the results of the test are part of the ordinary course of discovery. These are the certification checks, which are, which are a part of the foundation for the, for the certified test results. And there, and—"

¶ 67    The trial court interrupted and ruled as follows:

"I—all right. Well, I made a ruling back in June stating that any additional discovery that's turned over by the State is not to be used, and that I believe that was an appealable order, but I don't know if the State appealed that or not, that was in June of '23, but that was my ruling and so that ruling stands. So, anything to do—any discovery turned over after that date, including the CBT, cannot be used, and so I'm going to grant defendant's motion. You, you're not to argue it to the jury because I'm not sure how you're going to be able to get it in. All right."

¶ 68    That same day, the trial court entered a written order stating that "[d]efendant's second motion *in limine* is heard [and] granted based on the court's previous ruling [in June 2023]. As to the State mentioning during opening arguments or questioning, they may not mention the CBT result."

¶ 69                    4. *The State's Motion To Reconsider*

¶ 70    Later in October 2024, the State filed a motion to reconsider, arguing that the trial court had ordered on February 15, 2024, that the State provide the accuracy check logs by February 23, 2024, and the State complied with that order by producing the logs on February 22, 2024. Accordingly, the State asserted, the accuracy check logs should not be barred as part of the court's June 2023 "sanction" order, and the State should be able to admit evidence of the CBT at trial.

¶ 71                    5. *The Trial Court's Ruling on the State's Motion To Reconsider*

¶ 72    In February 2025 (we note that, between October 2024 and February 2025, the case had been continued for various reasons), the State filed an amended motion to reconsider the trial court's ruling granting defendant's second motion *in limine*. The State reiterated that it had tendered the CBT accuracy checks on February 22, 2024, and additionally argued that

(1) defendant "never requested accuracy certification checks" but had instead requested "calibration logs," which did not exist, (2) neither defendant's " 'Motion for Sanctions' [n]or 'Motion to Reconsider the Court's Decision On Allowing the State to Use PBT Logs after Late Discovery Disclosure' discussed or requested the accuracy certification checks for the CBT," (3) defendant had never established how he was prejudiced by the disclosure of the CBT accuracy checks on February 22, 2024, (4) defendant had possession of the CBT accuracy checks for nearly one year, and (5) "exclusion of evidence is a last resort, demanded only where a recess or a continuance would be ineffective."

¶ 73    Later that month, at a pretrial hearing, the parties advised the trial court that a ruling on the State's motion to reconsider was outstanding. The court asked the parties numerous questions about the procedural history of the case in order to refresh its recollection, and the parties reiterated their previous arguments. The court then ruled as follows:

"Well, this case has been going on for so long, and there were so many requests made, I don't have transcripts of every court appearance and—but I do have, you know, somewhat of a recollection about certain things with this case and the continued problem and deficiencies with the State turning over discovery. And this, and this, this case is from September of '21 and, you know, from the get-go that, that the State had issues with turning over discovery, and one resulted—or one of the results was an agreed order to rescind the statutory summary suspension, and then the case went on for another 2 and a half years until June of '23 with issues and we—that were brought up in front of the Court, that were argued in front of the Court, and I rendered my decision June 6th of '23 that anything else after that should be turned over to the defense. Well, in the above-captioned case, any

additional disclosure that is turned over by the State after today's date may not be used by the State. And so, I know irrespective of the argument about, you know, what, what the ruling was or wasn't in, in defendant's first motion *in limine*—what are you arguing in your second motion *in limine*?"

¶ 74 Defense counsel responded as follows:

"Judge, my argument is the State should not be able to use that within the opening arguments simply because one of the key foundational—or key foundational pieces for getting that [CBT] results is not available to the State, and they're not going to be able to present it, so they're not going to be able to establish the foundation at trial."

The trial court then continued its ruling as follows: "All right. Well, I—if—so if it was turned over after June, and I see that there is no dispute, then the State cannot use those. And I—so I'm going to deny the State's motion to reconsider, I'm granting defendant's [second motion *in limine*]." The court also entered a written order denying the State's motion to reconsider.

¶ 75 This appeal followed.

¶ 76 II. ANALYSIS

¶ 77 The State appeals, arguing the trial court abused its discretion by barring the State from mentioning the CBT results during opening statements, direct examination, and closing arguments. We agree, reverse the trial court's judgment, and remand for further proceedings.

¶ 78 A. The Applicable Law and Standard of Review

¶ 79 The Illinois Supreme Court has provided for limited discovery in misdemeanor cases. *People v. Schmidt*, 56 Ill. 2d 572, 574-75 (1974). Specifically, "[t]he State is required to

- 21 -

furnish defendants in misdemeanor cases with a list of witnesses [citation], any confession of the defendant [citation], evidence negating the defendant's guilt [citation], and, in this [DUI] case, the results of the breathalyzer test." *Id.* at 575. Later, in *People v. Kladis*, 2011 IL 110920, ¶ 29, the supreme court expanded that list to include dashcam video recordings of traffic stops in DUI cases. When doing so, the supreme court noted that "[o]ur decision to limit discovery in misdemeanor matters was based on 'our awareness of the very substantial volume of less serious cases and the impact upon their expeditious disposition' if broader discovery were required." *Id.* ¶ 25 (quoting *Schmidt*, 56 Ill. 2d at 574-75).

¶ 80    The purpose of misdemeanor discovery is "to enhance the truth-seeking process, to enable attorneys to better prepare for trial, to eliminate surprise and to promote an expeditious and final determination of controversies in accordance with the substantive rights of the parties." (Internal quotation marks omitted.) *Id.* ¶ 27; see *People v. Rubino*, 305 Ill. App. 3d 85, 87 (1999) ("The goals of discovery are to eliminate surprise and unfairness and to afford an opportunity to investigate."). "Discovery sanctions are not designed to punish and should be used to further these goals and to compel compliance." *People v. Strobel*, 2014 IL App (1st) 130300, ¶ 9.

¶ 81    "When the State fails to comply with a discovery order, the court may order a variety of sanctions, including discovery of the previously undisclosed statement, a continuance, the exclusion of the evidence *in toto*, or some other remedy it sees fit." (Internal quotation marks omitted.) *Id.* If a trial court imposes sanctions to enforce its discovery orders, "the sanctions [that] are imposed should be fashioned so as to meet the circumstances of the particular case and with the ultimate object of compelling compliance, not the punishment of a party for the oversight or errors of his attorney." *People v. Anderson*, 80 Ill. App. 3d 1018, 1019 (1980).

¶ 82    "The preferred sanction for a pretrial discovery violation is a continuance if it would

protect the defendant from surprise and prejudice." *Rubino*, 305 Ill. App. 3d at 88. "The exclusion of evidence is generally not a preferred sanction because it does not further the goal of truth seeking \*\*\*." *Strobel*, 2014 IL App (1st) 130300, ¶ 9. "Such a severe sanction is appropriate only where it is necessary to cure any prejudice caused by the discovery violation, or where the offending party's violation is determined to be willful and blatant." *People v. Schlott*, 2015 IL App (3d) 130725, ¶ 25. Excluding evidence "is an appropriate sanction only in the most extreme situations" (*Strobel*, 2014 IL App (1st) 130300, ¶ 9) and should be used only as a "last resort \*\*\* where a continuance would be ineffective" (*Rubino*, 305 Ill. App. 3d at 88).

¶ 83        A trial court's decision to impose sanctions is reviewed for an abuse of discretion. *Kladis*, 2011 IL 110920, ¶ 23. "A trial court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.*

¶ 84                                    B. This Case

¶ 85        The State asserts the trial court erred by barring mention of the CBT results because (1) the CBT accuracy check logs are not part of the State's routine discovery obligations, (2) defendant never requested CBT accuracy check logs in his motion, (3) the State complied with the court's order to produce the CBT accuracy check logs, and (4) the court's granting of defendant's second motion *in limine* contradicts its denial of defendant's first motion *in limine*.

¶ 86        Defendant responds that the trial court's June 2023 order barring the State from using any discovery disclosed after that date prevents the State from being able to lay a proper foundation for the admission of the CBT results at trial. Essentially, defendant's entire argument rests on the premise that the court's June 2023 sanction order governs all subsequent actions in the trial court.

¶ 87　　　　Nonetheless, we need not address each of these arguments individually because the trial court's October 2024 order granting defendant's second motion *in limine* and subsequent February 2025 order denying the State's motion to reconsider that October 2024 order, which prohibited the State from mentioning the CBT results at trial despite the CBT accuracy checks having been disclosed to defendant since February 2024, clearly contradict the principles of law applicable to discovery sanctions that we have recited above (*supra* ¶¶ 81-84). That is to say, once the CBT accuracy checks were tendered to the defense in February 2024, the purpose of misdemeanor discovery was completed, and the court's exclusion of that evidence at trial became solely a punitive measure.

¶ 88　　　　An example of the proper application of these principles is found in *People v. Bailey*, 2013 IL App (1st) 120757-U. On appellate review, the Appellate Court, First District, described the case in the following manner:

　　　　　"[The] [d]efendant *** was arrested for driving under the influence and other driving offenses and his driver's license was suspended. [The] [d]efendant subsequently filed a petition to rescind the statutory summary suspension of his driver's license and he filed discovery requests asking the State to produce various materials at the civil hearing on his petition, including a video made by an in-squad car camera (the in-squad video) of his stop and arrest. The State failed to comply with multiple court orders to produce the in-squad video in accordance with the discovery requests, and, accordingly, the trial court entered a sanction against the State in the statutory summary suspension proceeding by rescinding the summary suspension of defendant's driver's license. The trial court also entered a sanction against the State in the accompanying criminal case by barring the arresting officer

from testifying as to 'anything observed that could have been captured on [the in-squad] video, including but not limited to field sobriety tests and driving.' The State subsequently tendered a working copy of the in-squad video to defendant and then filed a motion to reconsider the sanction order entered in the criminal case and allow the officer to testify about her observations of defendant that could have been captured on the video. The trial court denied the State's motion to reconsider." *Id.* ¶ 2.

¶ 89    The appellate court reversed and remanded, concluding as follows:

"The denial of the motion to reconsider constituted an abuse of discretion. As a working copy of the in-squad video was produced to the defense prior to trial, the harsh sanction of exclusion of the arresting officer's testimony regarding the events she observed that could have been captured on the in-squad video was no longer appropriate; the preferred sanction of a continuance would have protected defendant from any surprise and prejudice while allowing him the opportunity to fashion his defense after viewing the video and engaging in additional investigation." *Id.* ¶ 52.

¶ 90    The *Bailey* court specifically noted that (1) the goal of discovery is to eliminate surprise and unfairness, (2) sanctions are designed to compel compliance with discovery, not punish, and (3) because the exclusion of evidence does not contribute to the goal of truth seeking, it should be ordered as a last resort and only when a recess or continuance would fail to protect the defendant from surprise or unfairness. *Id.* ¶ 51.

¶ 91    The *Bailey* court also rejected the defendant's arguments that the denial of the State's motion to reconsider, which left the sanction order in place, was proper because (1) the

State's violation "constituted a willful and flagrant disregard of the court's authority" and (2) the sanction was narrowly tailored and proportionate to the violation. *Id.* ¶¶ 53-54. In rejecting these arguments, the court repeatedly emphasized that the State's failure to produce the video, despite multiple orders to do so, justified the original sanction order, but once the video was tendered, the justification for the sanction no longer existed, and maintaining the sanction served only to punish the State, which is improper. *Id.* ¶¶ 52-53, 56.

¶ 92        Before concluding our discussion of *Bailey*, we wish to briefly note that, although *Bailey* is an unpublished order filed pursuant to Illinois Supreme Court Rule 23 (eff. June 3, 2025), we choose to discuss it here because (1) the facts are extremely similar to the present case and (2) we deem the analysis and reasoning employed by the *Bailey* court to be logical and persuasive, and we choose to discuss and employ it in this case. See *Osman v. Ford Motor Co.*, 359 Ill. App. 3d 367, 374 (2005) ("The fact one court has used certain reasoning in an unpublished opinion does not bar courts in this state from using the same reasoning in their decisions."); *People v. Munoz*, 2026 IL App (2d) 250025, ¶38 n.4. Although an unpublished order is not binding authority, we, as a court of review, are entitled to consider it for any persuasive weight we might give it, similar to when this court adopts an analysis from either a sister state appellate court or a law review article.

¶ 93        The notion that we must expunge *Bailey* or any other unpublished order from our thinking is wrong. Well-reasoned analysis merits consideration, wherever it is found.

¶ 94        Returning to the present case, we also find persuasive the analysis employed in *People v. Moore*, 2024 IL App (1st) 231537-U, ¶ 21, in which the appellate court reached a conclusion similar to the one in *Bailey*.

¶ 95        In *Moore*, the defendant was charged in June 2022 with misdemeanor DUI under sections 11-501(a)(1) (driving with a BAC of 0.08 or more) and 11-501(a)(2) (driving while "under

the influence of alcohol") of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(1), (2) (West 2022)). *Moore*, 2024 IL App (1st) 231537-U, ¶ 4. In January 2023, the defendant filed a motion for discovery sanctions, asking the trial court to bar the admission of his breath test result because the State had failed to tender "certification materials" that the defendant had requested. *Id.* ¶ 7. The trial court granted the defendant's motion, barring the State from presenting "breath evidence *** relating to the charge of a BAC of 0.08 or more," but it noted that the State still "ha[d] the (a)(2) to go on," meaning the charge of driving while under the influence of alcohol. (Internal quotation marks omitted.) *Id.*

¶ 96 The State subsequently tendered the certification materials and filed a motion to reconsider the sanction order because (1) the need for sanctions no longer existed, (2) the sanction was "extreme and tantamount to dismissal of the pertinent charge and frustrates the truth-seeking process," (3) the defendant was not prejudiced, and (4) there was no evidence of bad faith by the State. (Internal quotation marks omitted.) *Id.* ¶ 8.

¶ 97 The trial court denied the motion, noting that (1) although the current prosecutor had been diligent, her predecessors and the police department had not been diligent and (2) the defendant had been " 'put in a precarious position' of potentially demanding trial prior to having all discovery." *Id.* ¶ 9.

¶ 98 The *Moore* court reversed, concluding that the trial court abused its discretion by denying the State's motion to reconsider the sanction order. *Id.* ¶ 21. After noting many of the principles we have recited above (*supra* ¶¶ 81-84, 89-92), the court emphasized that (1) the defendant was not in custody during the discovery delay, (2) the case had not been set for trial at the time the missing certification materials were provided, meaning the defendant's ability to fully prepare for trial was not impeded, and (3) the trial court's ruling "effectively preclude[d] the State

- 27 -

from prosecuting the DUI charge against [the] defendant under section 11-501(a)(1)." *Moore*, 2024 IL App (1st) 231537-U, ¶¶ 19-20.

¶ 99　　　　The present case has many similarities to *Bailey* and *Moore*. Most important, like in those cases, after the trial court ordered discovery sanctions and before the case had been set for trial, the State tendered the requested materials. Here, like in those cases, when the State tendered the materials, the justification for the sanction order no longer existed.

¶ 100　　　　Defendant has articulated no persuasive argument—either in the trial court or before this court—that he was prejudiced by the delay. Instead, he had possession of the materials for a full year when the trial court denied the State's motion to reconsider, giving him ample time to review those materials, conduct any additional investigation, and fully prepare for trial. Indeed, the trial court specifically found, in March 2024, when denying the defendant's first motion *in limine* to bar the CBT results, that defendant had *not* been prejudiced by the State's delay in tending the accuracy checks. And, in October 2024, when granting defendant's second motion *in limine* to bar the CBT results, the court stated that defendant's argument that he was prejudiced was "spurious." We also note that defendant has not been in custody while this case has been pending.

¶ 101　　　　In contrast, the trial court's denial of the State's motion to reconsider effectively precludes the State from prosecuting defendant on one of the two DUI charges. The court's judgment therefore serves only to punish the State, hinder the truth-seeking process, and violate the principle that exclusion should be used only as *a last resort* when a continuance would fail to save the defendant from surprise or unfairness. See *Strobel*, 2014 IL App (1st) 130300, ¶ 9 ("The exclusion of evidence *** is an appropriate sanction only in the most extreme situations and is disfavored [citation].").

¶ 102  We also reject the notion that the State's delay in tendering the materials was a willful or flagrant disregard of the trial court's authority. Although we sympathize with the court's efforts in this case to manage discovery—and by all accounts the task was akin to herding cats—we observe certain mitigating circumstances in this case that, while not excusing the State's actions, blunt their purposefulness.

¶ 103  For example, the transcript reflects the parties' confusion regarding whether defendant sought (1) testing logs (a log of all tests conducted on the device) or (2) calibration logs (logs showing the machine was routinely maintained and accurate). Within this record, the same documents were referred to by different parties as "calibration logs," "certification logs," and "accuracy certification checks."

¶ 104  Compounding this confusion over language was the use of two types of devices in this case—specifically, the PBT and the CBT. Multiplying that confusion was the revolving door of prosecutors on this case, who all seemed to have different conversations with different police officers regarding different devices and different descriptions of what types of logs the State was seeking. And on top of that, the prosecutors appeared to adhere to a common practice of requesting the accuracy certification checks only upon the case being set for trial.

¶ 105  Moreover, the trial court issued conflicting orders regarding discovery, such as the court's (1) June 2023 order preventing the State from using any discovery tendered past that date, (2) February 2024 order requiring the State to tender the accuracy checks by February 23, 2024, (3) March 2024 order denying defendant's first motion *in limine* to bar the CBT results at trial, and (4) October 2024 order granting defendant's second motion *in limine* to bar the CBT results at trial.

¶ 106  Put simply, confusion abounded in this case to the degree that we cannot say the

State's actions were willful or in bad faith.

¶ 107    We emphasize that, (1) although our sympathies lie with the trial court's task in conducting discovery and (2) we are generally loathe to disturb the trial court's exercise of its discretion in managing discovery in its courtroom, the law is clear that the exclusion of evidence is a last resort and should not be exercised as a punitive measure meted out in frustration, which appears to be what occurred in this case.

¶ 108    For example, throughout the proceedings, the trial court demonstrated a keen knowledge of the principles of misdemeanor discovery sanctions, repeatedly demanding that defendant show how he was prejudiced and noting that the court had the ability to reverse its own discovery orders. However, at the last hearing, when denying the State's motion to reconsider, the court seemed to abandon those principles and summarily reverted to its June 2023 order without application of the guiding principles of law, as the court had earlier done. The court's doing so was arbitrary, punitive, and an abuse of its discretion.

¶ 109    Accordingly, we reverse the trial court's order granting defendant second motion *in limine* to bar the CBT results at trial.

¶ 110                            III. CONCLUSION

¶ 111    For the reasons stated, we reverse the judgment of the trial court and remand for further proceedings.

¶ 112    Reversed and remanded.

*People v. Parentice*, 2026 IL App (4th) 250222

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 21-DT-708; the Hon. Philip J. Nicolosi, Judge, presiding. |
| **Attorneys for Appellant:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Courtney M. O'Connor, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | Jonathan James, of Law Office of Jonathan James, LLC, of Rockford, for appellee. |